SIERRA CLUB, a nonprofit corporation; Wilderness Society, a nonprofit corporation; National Audubon Society, a nonprofit corporation; Natural Resources Defense Council, a nonprofit corporation; Environmental Defense Fund, a nonprofit corporation; National Wildlife Federation, a nonprofit corporation, Plaintiffs,

and

State of California, Plaintiff in Intervention,

v.

James G. WATT, as Secretary of the Department of Interior; Robert F. Burford, as Director of the Bureau of Land Management, Defendants,

and

Santa Fe Pacific Railroad Company, Mountain States Legal Foundation, County of Montezuma, Colorado, and Modesto and Turlock Irrigation Districts, Defendants in Intervention.

No. Civ. S–83–035 LKK.

United States District Court, E.D. California.

April 18, 1985.

As Amended April 24, 1985.

Laurens H. Silver, Karin P. Sheldon, Johanna Wald, San Francisco, Robert Dreher, Hill & Barlow, Boston, Mass., for plaintiffs.

John K. Van de Kamp, Atty. Gen. of the State of Cal., Theodora Berger, Asst. Atty. Gen., Craig C. Thompson, Deputy Atty. Gen., Sacramento, Cal., for intervenor-plaintiffs People of the State of Cal., ex rel. Van de Kamp.

Donald B. Ayer, U.S. Atty., Gary B. Randall, Atty., Dept. of Justice, Washington, D.C., for Federal defendants.

William H. Mellor III, Constance E. Brooks, Steven D. Ellis, Denver, Colo., for defendant-intervenors.

John R. Duree, Jr., Michael J. Weinberger, Sacramento, Cal., White, Fine & Verville, Lee C. White, Peter S. Leyton, Washington, D.C., Damrell, Damrell & Nelson, Frank C. Damrell, Jr., Ann M. Veneman, Modesto, Cal., for defendants-in-intervention Modesto and Turlock Irrigation Districts.

Ann Straw Rieck, Ronald A. Lane, Chicago, Ill., Benjamin B. Salvaty, Clay M. Smith, Los Angeles, Cal., for defendant in intervention Santa Fe Pacific R. Co., Jerome C. Muys, Washington, D.C., of counsel.

Charles C. Dietrich, Sausalito, Cal., Mary Jane C. Due, Washington, D.C., for amicus curiae American Mining Congress.

*OPINION AND ORDER*

KARLTON, Chief Judge.

## I

## BACKGROUND

### A. *Federal Land Policy And Management Act*

In 1976, Congress enacted the Federal Land Policy and Management Act

(FLPMA), 43 U.S.C. §§ 1701–1784 (Supp. 1983), to provide "the first comprehensive, statutory statement of purposes, goals and authority for the use and management of about 448 million acres [1] of federally-owned lands administered by the Secretary of Interior through the Bureau of Land Management." S.Rep. No. 583, 94th Cong., 1st sess. 24 (1975).[2] FLPMA reflected a major change in federal policy. Previously, the lands held by the Bureau of Land Management (BLM) (and its predecessor the General Land Office) were viewed as only temporarily within the custody of the United States and it was expected that their ultimate destiny was private ownership.[3] Under FLPMA, however, BLM lands were to be held in permanent federal ownership unless, as a result of land use planning, the disposal of a particular parcel would serve the national interest. FLPMA § 102(a)(1), 43 U.S.C. § 1701(a)(1).[4]

In FLPMA Congress declared as a national policy that public lands held by the BLM were to be managed on the basis of multiple use and sustained yield unless otherwise specified by law, § 102(a)(7), 43 U.S.C. § 1701(a)(7). Nonetheless, Congress also declared as national policy that:

[T]he public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archaeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use; . . .

FLPMA § 102(a)(8), 43 U.S.C. § 1701(a)(8). Congress also required that regulations

and plans for the protection of public land areas of critical concern be promptly developed, § 102(a)(11), 43 U.S.C. § 1701(a)(11).

As the first step in the process of implementing the new national policy the Secretary of Interior (hereinafter "the Secretary") was directed to prepare and maintain an inventory of all public lands and assess "their resource and other values." FLPMA § 201(a), 42 U.S.C. § 1711(a). As part of the process of inventory the Secretary was directed to review roadless areas of 5,000 acres or more and roadless islands of the public lands having wilderness characteristics as described in the Wilderness Act, 16 U.S.C. §§ 1131–1136 (1974 & Supp. 1983), and to report to the President his recommendation as to the suitability or nonsuitability of each area for inclusion in the national Wilderness Preservation System. FLPMA § 603(a), 43 U.S.C. § 1782(a). "Public lands" required to be reviewed under section 603(a) are lands and interests in land owned by the United States and managed by the BLM, excepting Outer Continental Shelf and native trust lands. FLPMA § 103(e), 43 U.S.C. § 1702(e). This task was to be completed within fifteen years of FLPMA's enactment. FLPMA § 603(a), 43 U.S.C. § 1782(a). The President, in turn, is to make his recommendation to Congress as to the inclusion of these lands in the wilderness system within two years of the receipt of the Secretary's report. FLPMA § 603(b), 43 U.S.C. § 1782(b). Until Congress determines otherwise, the Secretary is to manage these lands

so as not to impair the suitability of such areas for preservation as wilderness, subject, however, to the continuation of existing mining and grazing uses and mineral leasing in the manner and degree in which the same was being conducted

---

1. Approximately 176 million of these acres lie in the western continental United States.

2. While Congress has established statutory bases for the management of other, smaller federal land systems such as the national parks, forests and wildlife refuges, no similar legislative foundation existed for the BLM lands prior to the enactment of FLPMA. S.Rep. No. 583 at 24.

3. See Leshy, *Wilderness and Its Discontents—Wilderness Review Comes to the Public Lands*, Ariz.St.L.J. 361, 362–63 (1981).

4. FLPMA repealed many of the statutes providing for the sale of public lands. See FLPMA, Pub.L. No. 94–579 §§ 702–706, 90 Stat. 2787–2794 (1976).

on October 21, 1976: [the date that FLPMA was enacted] *Provided*, That, in managing the public lands the Secretary shall by regulation or otherwise take any action required to prevent unnecessary or undue degradation of the lands and their resources or to afford environmental protection.

FLPMA § 603(c), 43 U.S.C. § 1782(c) (emphasis in original). Section 603(c) provides that once Congress has formerly designated an area for inclusion in the Wilderness Preservation System, the management provisions of the Wilderness Act apply. FLPMA § 603(c), 43 U.S.C. § 1782(c).[5]

### B. *Implementation of the Section 603 Wilderness Review*

In order to carry out the wilderness review provisions of section 603(a) and other sections of the Act, including the inventory preparation requirement of section 201, the former Secretary of Interior, Cecil Andrus, established a wilderness review program consisting of three phases: inventory, study, and reporting. During the inventory phase, those roadless areas of the public lands which have wilderness characteristics were identified as "wilderness study areas" (WSA's). The procedure for determining whether an area of the public lands met WSA status was provided in the *"Wilderness Inventory Handbook"* (WIH), a statement of policy, direction, procedures and guidance for the wilderness review program published by the BLM on September 27, 1978. The WIH provided that, with certain exceptions, the wilderness inventory be conducted on *all* public lands administered by the BLM.[6] The WIH prescribes that in choosing areas for section 603 WSA status the factors to be used are:

1. Size. At least 5,000 contiguous roadless acres of public land.

2. Naturalness. The imprint of man's work must be substantially unnoticeable.

3. Either:

a. An *outstanding* opportunity for solitude, or

b. An *outstanding* opportunity for a primitive and unconfined type of recreation.

To qualify for wilderness study identification an area of public land must be shown to meet both factors 2 and 3. An island may be of any size.

WIH at 6 (emphasis in original).

In addition, the WIH directed that other areas which had wilderness characteristics as defined in (2) and (3) above, but which contained fewer than 5,000 acres, were still eligible for WSA identification if they were either:

1. Contiguous with land managed by another agency which has been formally determined to have wilderness or potential wilderness values, or

2. Contiguous with an area of less than 5,000 acres of other Federal lands administered by an agency with authority to study and preserve wilderness lands, and the combined total is 5,000 acres or more, or

3. Subject to strong public support for such identification and it is clearly and obviously of sufficient size as to make practicable its preservation and use in an unimpaired condition, and of a size suitable for wilderness management.

WIH at 6.

In further implementation of the statute, the BLM published on December 12, 1979, an *"Interim Management Policy and Guidelines for Lands Under Wilderness Review"* (IMP) which set forth the guide-

---

**5.** These management provisions, as prescribed by the Wilderness Act of 1964, appear at 16 U.S.C. §§ 1131–1136.

**6.** The exceptions were lands:
 a. where the United States owns the minerals but the surface is *not* Federally owned
 b. being held for the benefit of Indians, Aleuts, and Eskimos

 c. tentatively approved for State selection in Alaska
 d. on the Outer Continental Shelf
 e. which are identified by BLM as commercial timber areas on the revested Oregon and California (O & C) grant lands.
WIH at 4.

lines under which the BLM would manage the lands subject to wilderness review, but for which the BLM wilderness inventory process had not yet been completed and lands which the BLM has determined to have wilderness characteristics. IMP at 5. The interim management policy also applies to WSA's during the time the area is under wilderness review and until Congress acts. *Id.* The IMP required that lands identified as having wilderness characteristics be managed so as not to impair their suitability for preservation as wilderness. With respect to WSA's over 5,000 acres, this requirement is derived from section 603(c) of FLPMA, 43 U.S.C. § 1782(c). IMP at 6. Under the IMP, lands with wilderness characteristics but less than 5,000 acres in size were to be managed under a modified nonimpairment standard pursuant to section 302(b), 43 U.S.C. § 1732(b). IMP at 10.[7] The goals of management under the nonimpairment standard are: (1) to ensure that any area that now satisfies the wilderness definition in section 2(c) of the Wilderness Act, 16 U.S.C. § 1131(c),[8] will satisfy that definition both when the Secretary sends his recommendation to the President and thereafter until the Congress acts, and (2) to ensure that, when the Secretary sends his wilderness recommendation to the President, the area's wilderness values have not been so degraded, compared with the area's values for other purposes, as to significantly constrain the Secretary's recommendation with respect to the area's suitability for preservation as wilderness. IMP at 7–8.

FLPMA was passed in October of 1976 and the inventory began in 1978. By November of 1980, the total acreage subject to the Act (173,727,000 acres) had been inventoried. Secretary Andrus, by order of the Federal Register, placed 919 areas totaling 23,772,000 acres in WSA status and he found the balance of land to be without the requisite wilderness characteristics. 45 Fed.Reg. 77,574 (November 14, 1980) (hereinafter "Andrus order").

### C. *Secretary Watt's December 30, 1982, Order*

On December 30, 1982, a new Secretary of Interior, James Watt, published an order in the Federal Register which affected the status of approximately one million acres of public lands then in WSA status. 47 Fed.Reg. 58,372 (December 30, 1982) (hereinafter "Watt order"). The order was in several parts: First, the Secretary ordered that lands in which the United States does not own the subsurface mineral rights (split-estate lands) be removed from the wilderness inventory altogether and that they no longer be managed under the nonimpairment Interim Management Policy guidelines. *Id.* After this deletion the state directors were ordered to reexamine the WSA's in which split-estates were located and to determine whether, after deletion of such lands, the remaining WSA's amounted to more than 5,000 acres. If not, they were also to be deleted. *Id.* Even if the WSA, after deletion of the split estate lands, still amounted to 5,000 acres, the state directors were ordered to reexamine

**7.** As noted, section 302(b), 43 U.S.C. § 1732(b), directs the Secretary to take any action necessary to prevent unnecessary or undue degradation of the public lands. As will be seen, it is this section which it is argued provides the Secretary with discretion to manage lands under 5,000 acres in order to preserve their wilderness characteristics. *See* n. 11.

**8.** The Wilderness Act of 1964 defines "wilderness" as follows: "A wilderness, in contrast with those areas where man and his own works dominate the landscape, is hereby recognized as an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain. An area of wilderness is further defined to mean in this

chapter an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions and which (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value." *16 U.S.C. § 1131(c)*.

the wilderness status of these areas if the deletion substantially altered the boundary or configuration of the WSA. *Id.; see also* Dept. of Interior Instruction Memorandum No. 83–188, December 23, 1982. Specifically, the Secretary ordered that certain WSA's totaling 327,061 acres of split-estate lands in Arizona and New Mexico be deleted immediately. 47 Fed.Reg. 58,375. Specific orders as to other states were soon to follow.

Second, the Secretary determined that the less than 5,000 acre lands were not properly considered for wilderness status under FLMPA as a matter of law. He ordered that 158 less than 5,000 acre areas totaling 340,526 acres should be deleted from WSA status.[9] 47 Federal Register 58,372 (1982). The Secretary further ordered that these areas could only be considered for other forms of protective management if such action was authorized by the BLM Director.

Third, the Secretary ordered that all roadless areas larger than 5,000 acres found to have wilderness characteristics only in association with, or in conjunction with, contiguous wilderness or wilderness candidate areas administered by the Forest Service, National Park Service, or Fish and Wildlife Service, should be excluded from the wilderness inventory unless they are determined to have wilderness attributes of their own. He ordered that such areas should be reexamined to determine whether such areas still exceed 5,000 acres and have wilderness attributes on their own after exclusion of all areas adjacent to wilderness or wilderness candidate areas administered by other agencies. 47 Fed.Reg. 58,372.

The Secretary's action was described in the Federal Register as made pursuant to an Opinion of his Solicitor, dated December 15, 1982. In turn, this Opinion adopted certain interpretations of section 603 of FLPMA, 43 U.S.C. § 1782, enunciated by the Interior Board of Land Appeals [10] in three cases: *Santa Fe Pacific Railroad Co.*, 64 IBLA 27 (1982); *Don Coops, et al.*, 61 IBLA 300 (1982); and *Tri-County Cattlemen's Ass'n*, 60 IBLA 305 (1981). In these three opinions, the IBLA held that certain areas of the public lands had been improperly designated as WSA's under section 603 and discussed the applicability of section 603 to public lands generally.[11]

On March 14, 1983, the BLM issued Department of Interior Instruction Memorandum No. 83–188, Change 1, to all State Directors detailing comprehensive procedures to be used in implementing Secretary

---

**9.** The affected areas by state are as follows:

| | | |
|---|---|---|
| Arizona | 17 WSAs | 35,232 acres |
| California | 56 WSAs | 123,600 acres |
| Colorado | 17 WSAs | 36,784 acres |
| Idaho | 10 WSAs | 21,745 acres |
| Montana | 16 WSAs | 42,175 acres |
| Oregon | 8 WSAs | 11,942 acres |
| Nevada | 3 WSAs | 12,363 acres |
| New Mexico | 7 WSAs | 11,129 acres |
| Utah | 14 WSAs | 25,187 acres |
| Wyoming | 10 WSAs | 20,369 acres |
| Totals | 158 WSAs | 340,526 acres |

**10.** The Interior Board of Land Appeals decides appeals from Department of Interior officials' decisions relating to the use and disposition of public lands, mineral resources and the conduct of surface coal mining. 43 C.F.R. § 4.1(b)(3) (1984). The Secretary has authority to review and reconsider any decision rendered by the Board. 43 C.F.R. § 4.5 (1984).

**11.** In *Santa Fe Pacific Railroad Co.* the IBLA ruled (5 to 3) that split-estate lands could not be included in the wilderness inventory. The majority asserted that such inclusion violated section 701(h) of FLPMA, which provides "[a]ll actions by the Secretary concerned under this Act shall be subject to valid existing rights." *See* 43 U.S.C. § 1701 note (h). 64 IBLA at 34. In *Tri-County Cattlemen's Ass'n*, the Board ruled that BLM did not have the authority to designate a roadless area of less than 5,000 acres as a WSA pursuant to section 603(a) of FLPMA. The Board held, however, that such management was authorized by §§ 202 and 302, 43 U.S.C. §§ 1712 and 1732. Accordingly, IBLA affirmed the area's designation as a WSA, modifying the BLM decision to clarify that the designation had not been made pursuant to section 603. 60 IBLA at 314–15. Finally, in *Don Coops, et al.,* the IBLA ruled that to the extent BLM had assessed an inventory unit's wilderness characteristics "in association with" a contiguous area of Federal lands not administered by BLM, it has exceeded its statutory authority. 61 IBLA at 306 (1982).

Watt's order. With respect to the split-estate lands, the State Directors were given two options: (1) to study the lands for forms of protective management other than WSA or (2) to manage the lands for general multiple use development. Under either option, the lands are not to be considered for wilderness status. Until the Director of the BLM approves the State Director's recommendations, these lands are to be managed in a manner so as to prevent unnecessary or undue degradation of the lands. With respect to the areas under 5,000 acres, the Instruction Memorandum directed the State Directors to determine the suitability of each area for: (1) wilderness consideration under section 202 of FLPMA, 43 U.S.C. § 1712; (2) other forms of protective management; or (3) management under a multiple use standard.

While the total figures are necessarily approximate due to changes in inventory, it is clear that the Secretary's order has had a profound effect.[12]

On January 13, 1983, plaintiffs brought this suit. They attack Secretary Watt's order on a variety of grounds. They assert that the Secretary's exclusion of the split-estate lands over 5,000 acres violated FLPMA; that the exclusion of land under 5,000 acres is subject to being set aside as a violation of the National Environmental Protection Act (NEPA), 42 U.S.C. § 4321 et seq. and that the procedure used by the Secretary violated the Administrative Procedure Act (APA), 5 U.S.C. § 551–559 (1977 & Supp.1983). I issued a preliminary injunction on October 21, 1983, as plaintiffs raised serious questions as to the merits of their case and the balance of hardships tipped in plaintiffs' favor. The parties then filed cross motions for summary judgment. Concurrent with these motions, certain intervenors suggested that necessary parties had not been joined. All those motions are disposed of herein.

## II

### STANDING

 Defendant United States challenges plaintiffs' standing to raise their claims in this litigation asserting that plaintiffs have failed to establish sufficient injury-in-fact under Article III of the Constitution. The Government contends that injury to plaintiffs will arise only when development activities are approved for the areas at issue in this litigation. Alternatively, the Government argues that even if present injury is established, the court should dismiss this action because plaintiffs' lawsuit seeks to adjudicate abstract questions of wide public significance which should most appropriately be addressed by the Congress.

---

**12.** The impact of Watt's order appears to be as follows:
 1. 525,000 acres of split-estate lands have been removed from wilderness consideration under section 603 of FLPMA.
 2. 100,000 acres of non split-estate lands found to lack wilderness characteristics after deletion of split-estate lands have been recommended for release to multiple use management.
 3. 124 of the 158 areas under 5,000 acres have been recommended for no further study as wilderness.
 4. Certain WSA's in Nevada, Oregon and Colorado have been released to multiple use management.
 5. 138,000 acres of contiguous areas over 5,000 acres determined not to have wilderness attributes on their own have been released to multiple use management.
 The cumulative totals are as follows:

| | |
|---|---|
| Total number of acres (in ten states) removed from wilderness inventory, released from further wilderness study, and released into multiple use other than wilderness | 1,218,873 acres |
| Total number of acres (in ten states) removed from wilderness inventory and no longer to be studied for wilderness but recommended for study for protective classifications other than wilderness | 321,328 acres |
| Grand Total number of acres (in ten states) removed from wilderness inventory and released from further wilderness study | 1,540,201 acres |

There is some dispute as to the exact acreage affected by the Secretary's decision. As the issues presented by this case are purely legal, this does not affect disposition of the motions.

■ Standing implicates two separate but closely related components: a constitutional component derived from Article III of the Constitution, and a prudential component based on notions of judicial restraint.

### A. *Constitutional Standards*

■ The Ninth Circuit has held that Article III "limits the judicial power of the United States to actual cases and controversies," *Scott v. Rosenberg,* 702 F.2d 1263, 1267 (9th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 1439, 79 L.Ed.2d 760 (1984).

> The 'gist of the question of standing' is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.

*Id., quoting Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). The court went on to explain that to satisfy the constitutional component of standing three things must be shown: first, that the party "personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," 702 F.2d at 1267, *quoting Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979); second, "that the injury can be fairly traced to the challenged action, [and third, that it] is likely to be redressed by a favorable decision." *Id., quoting Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976). *See also, Preferred Communications, Inc. v. City of Los Angeles,* 754 F.2d 1396, 1403, (9th Cir.1985).

The Supreme Court has recently suggested that, because resolution of standing issues tends to be a question of degree rather than kind, i.e., identifying a point on a continuum, determinations of standing are "not susceptible of precise definition." *Allen v. Wright,* — U.S. —, —, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556 (1984). Nonetheless, the Court explained that the notion of standing gains considerable definition from previous case law and in many cases can be determined by examining the allegations of the particular complaint and comparing them to those made in prior standing cases. *Id.* The Court taught:

> Typically, however, the standing inquiry requires careful judicial examination of the complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted. Is the injury too abstract, or otherwise not appropriate, to be considered judicially cognizable? Is the line of causation between the illegal conduct and the injury too attenuated? Is the prospect of obtaining relief from the injury as a result of a favorable ruling too speculative?

*Id.* With these general guidelines in mind, I turn to the instant case.

Plaintiffs, several national environmental organizations, bring this action on behalf of their members [13] alleging that those members use the public lands in question for a variety of purposes including hiking, camping, wildlife viewing, photography, scenic study, and other forms of recreation. Complaint, ¶¶ 5–10.[14]

### 1. *Personal Injury*

■ To meet the personal injury test, plaintiffs must demonstrate that they have suffered a "distinct and palpable" injury that is not "abstract, conjectural or hypothetical." *Allen v. Wright,* — U.S. at —, 104 S.Ct. at 3325. Plaintiffs allege that their aesthetic, conservation and recreation interests will be adversely affected by defendants' actions. Specifically, they

---

**13.** "It is clear that an organization whose members are injured may represent those members in a proceeding for judicial review." *Sierra Club v. Morton,* 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636; *Forelaws on Board v. Johnson,* 743 F.2d 677, 680 (9th Cir.1985).

**14.** Plaintiffs have proved these allegations for summary judgment purposes by the filing of affidavits from the officers of these organizations setting out their interests in detail.

allege that by virtue of Secretary Watt's order, lands exhibiting wilderness characteristics, *see* n. 8, *supra,* have become available for development which will impair those values. For example, they allege that these areas will be opened to oil and gas exploration, road construction, and off-road vehicle use. The cumulative effect of these activities, they assert, will permanently impair the unspoiled natural character of these lands and render them unsuitable for wilderness designation by Congress to the detriment and harm of plaintiffs and their members.

It is clearly established that "[a]esthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society ..." *Sierra Club v. Morton* at 734. Similar harm to the environment was pled in the complaint in *Sierra Club v. Morton* and the court said "[w]e do not question that this type of harm may amount to an 'injury in fact' sufficient to lay the basis for standing ..." *Id. See also, Stratman v. Watt,* 656 F.2d 1321, 1324 (9th Cir.1981), *cert. dism.,* 456 U.S. 901, 102 S.Ct. 1744, 72 L.Ed.2d 170 (1982); *California v. Watt,* 683 F.2d 1253, 1270–71 (9th Cir.1982), *rev'd on other grounds,* 464 U.S. 312, 104 S.Ct. 656, 78 L.Ed.2d 496 (1984). Accordingly, the court finds that the type of harm alleged is of the "distinct" and "palpable" kind sufficient to support standing.[15]

Plaintiffs' injury must also be personal. *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. at 39, 96 S.Ct. at 1924. Plaintiffs' allegations are sufficient to meet that criterion as well. They have alleged that their members use the lands in question for a variety of aesthetic and recreational uses. The courts have repeatedly held that such allegations suffice. *See Gonzales v. Gorsuch,* 688 F.2d 1263, 1266 (9th Cir.1982) ("Plaintiff's interest as one who uses and enjoys the Bay is sufficient to meet the liberal personal stake requirement applicable to environmental

plaintiffs."); *California v. Watt,* 683 F.2d at 1270–71 (allegation that members of environmental groups enjoyed recreational activities in areas affected by lease sale enough to meet personal stake requirement); *American Motorcyclist Ass'n v. Watt,* 543 F.Supp. 789, 792 (C.D.Cal.1982) (allegation that members use portion of desert affected by challenged motorized-vehicle route designation for recreation and study sufficient to meet injury standards for standing), *aff'd,* 714 F.2d 962 (9th Cir. 1983).

### 2. *"Fairly Attributable" to Defendants' Actions*

As noted above, plaintiffs must sufficiently allege that the injury is "fairly attributable" to defendants' actions. *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 44, 96 S.Ct. 1917, 1927, 48 L.Ed.2d 450 (1976); *Warth v. Seldin,* 422 U.S. 490, 507, 95 S.Ct. 2197, 2209, 45 L.Ed.2d 343 (1975). Plaintiffs allege that Secretary Watt's order released the lands in issue from the section 603 wilderness inventory and permitted multiple use management of them. It is this release which they assert permits development of these lands destroying their wilderness qualities and causing the injury of which they complain. Defendants argue in response that these released lands may still be subject to other forms of nonimpairment management which will preserve their wilderness character and thus that there is not a sufficient relationship between the Secretary's action and the development of these lands. Moreover, they argue causation is not sufficiently shown because any development will be by private parties whose decision to develop is a matter of speculation and, in any event, not attributable to the Secretary's order.[16]

Defendants' argument will not lie. The Secretary's order, as in other cases of land management involving the removal of public property from wilderness consideration,

---

**15.** Given this resolution, the court need not examine the Sierra Club's allegation of economic harm.

**16.** These arguments also suggest questions of ripeness. Those questions are resolved *infra. See* § III.

has a palpable and thus cognizable effect. *See California v. Bergland,* 483 F.Supp. 465, 476 (E.D.Cal.1980), *aff'd in part, rev'd in part sub nom, California v. Block,* 690 F.2d 753 (9th Cir.1982). Here, as in *Bergland,* these areas will not be considered for the affirmative protections of wilderness classification under the Secretary's order, and any future opportunity for wilderness classification may permanently be foreclosed because of development activities.

Defendants' suggestion that the real cause of plaintiffs' injury is potential development by persons other than BLM also will not lie. The development activity of third parties on these lands is not "the independent action of some third party not before the court," *Simon,* 426 U.S. at 42, 96 S.Ct. at 1926, subject only to speculation, but instead is a direct result of the Secretary's action. Central to this issue are traditional notions that for there to be a break in the chain of causation, the intervening event must be not only a cause, but the only cause of injury; i.e., if the complained of action is a "but for" cause—a cause, even if not the only cause—it suffices for standing purposes. *See Scott v. Rosenberg,* 702 F.2d at 1268 ("But for the FCC's actions, no injury or threat of injury could have occurred."). The management protocol imposed by the BLM determines the level and type of activity on BLM lands. That protocol is determined by the Secretary and it is his order that is the subject of the lawsuit. Plaintiffs' claims, therefore, are fairly traceable to defendants' actions.

### 3. *Likelihood That Relief Will Redress Injury*

I turn to the third prong of the constitutional standing requirement: whether plaintiffs' injury is likely to be redressed by the requested relief. Plaintiffs meet this requirement. They seek a permanent injunction requiring defendants to restore the split-estates to the section 603 wilderness inventory and requiring the preparation of an EIS and compliance with the APA in the release of the less than 5,000 acre lands from the wilderness inventory. Clearly, this remedy would redress plaintiffs' alleged injury by returning certain lands to wilderness study status and by compelling the Government to examine the consequences of its action as to other lands. *Stratman v. Watt,* 656 F.2d at 1324; *American Motorcyclist Ass'n v. Watt,* 543 F.Supp. at 792. Although as I explain *infra,* it does not follow that under such an order no development will be permitted, immediate relief as to the complained of harm would result from an affirmative order. This lawsuit seeks to end the potential for development occasioned by the Secretary's order, and clearly an invalidation of that order would accomplish that relief.

Having found that plaintiffs satisfy the constitutional requirements for standing, I turn to the prudential considerations.

### B. *Prudential Standards*

The purpose of the so-called "prudential" standing requirements is to ensure that courts address practical and real disputes capable of legal resolution, rather than abstract controversies about the desirability of one course of conduct versus another. In general, these considerations require that plaintiffs show that their own legal rights and interests are tendered, and not merely generalized grievances shared by all citizens, *Scott v. Rosenberg,* 702 F.2d at 1267, thus avoiding "questions of broad social import where no individual rights would be vindicated." *Gladstone Realtors v. Village of Bellwood,* 441 U.S. at 99–100, 99 S.Ct. at 1608. As a general formulation, the prudential component of standing requires plaintiffs to allege that they are at least arguably within the zone of interests protected or regulated by the statutory framework within which the claim arises. *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 39 n. 19, 96 S.Ct. 1917, 1925 n. 19, 48 L.Ed.2d 450 (1976). *See also, Preferred Communications v. City of Los Angeles,* 754 F.2d 1396, 1403 n. 5 (9th Cir.1985).

Resolution of this issue in the case at bar seems reasonably straightforward. First, plaintiffs clearly assert their own legal rights and do not assert the legal interests

of others except as they are members of plaintiff organizations. *Warth v. Seldin,* 422 U.S. at 499, 95 S.Ct. at 2205; *Allen v. Wright,* —— U.S. at ——, 104 S.Ct. at 3325 (1984). Second, plaintiffs' claims are not " 'abstract questions of wide public significance' which amount to 'generalized grievances' pervasively shared and most appropriately addressed in the representative branches." *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 475, 102 S.Ct. 752, 760, 70 L.Ed.2d 700 (1982), *quoting Warth v. Seldin,* 442 U.S. at 499–500, 95 S.Ct. at 2206. Instead, they are specific challenges to the Secretary's interpretation of a statute. That is, to the degree statutory interpretation is at issue, the representative branches have already resolved the broad policy questions. *See, e.g.,* 43 U.S.C. § 1701(a)(8).[17] Finally, plaintiffs' claims fall within the "zone of interests to be protected or regulated by the statute … in question." *Association of Data Processing Service Organizations v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970); *Kunaknana v. Clark,* 742 F.2d 1145, 1148 (9th Cir.1984); *see* FLPMA § 102(a)(8), 43 U.S.C. § 1701(a)(8). To the degree this suit seeks to ensure the management standards arguably required by the statute be maintained, it falls directly within the zone of the interests the statute seeks to protect.

Defendants' argument that the issue of whether particular lands shall be included within the wilderness system is a congressional issue misses the point. As I explained above, the whole point of the wilderness study is for BLM to provide Congress with recommendations as to which land should be permanently designated as wilderness. To the degree that multiple use precludes inclusion of such land, Congress is deprived of the opportunity to make that judgment. *See California v. Bergland,* 483 F.Supp. at 486.

I conclude that the plaintiffs have demonstrated standing as a prudential matter.

**17.** Quoted in § I.A., *supra.*

## III

### RIPENESS

Defendants assert that the case should be dismissed because it is not ripe for determination.

> The basic rationale of the ripeness doctrine 'is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'

*Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Comm.,* 461 U.S. 190, 200, 103 S.Ct. 1713, 1720, 75 L.Ed.2d 752 (1983), *quoting Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). The question of ripeness turns on the "fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration." *Id. quoting Abbott Laboratories* at 149, 87 S.Ct. at 1515.

Plaintiffs have satisfied both prongs of the *Abbott Laboratories* test. As to the first prong, ripeness is established if the agency action is final and the questions raised are legal rather than factual. *Abbott Laboratories,* 387 U.S. at 149, 87 S.Ct. at 1515; *American Motorcyclist Ass'n v. Watt,* 543 F.Supp. 789, 793 (C.D.Cal.1983). Here, while there may be further proceedings by the BLM to determine the management protocol for particular acreage, the Secretary's action is final as to their consideration for wilderness status. *Cf. California v. Bergland,* 483 F.Supp. at 476–77. As the Supreme Court has taught, "[t]he cases dealing with judicial review of administrative actions have interpreted the 'finality' element in a pragmatic way." 387 U.S. at 149, 87 S.Ct. at 1516. As a pragmatic matter, the effect of the Secretary's action is to preclude wilderness designation for

these lands no matter what management protocol is eventually determined by the BLM state directors.

As to the second prong, the Secretary's action is "sufficiently direct and immediate as to render the issue appropriate for judicial review at this stage." 387 U.S. at 152, 87 S.Ct. at 1517. I have noted above that the Secretary's order potentially results in permanent loss of the land in question for inclusion in the national wilderness system. As my brother in the Central District has observed, "[s]ince potentially irreparable environmental harm is threatened by application of these criteria, it would impose a substantial hardship on plaintiffs and would disserve the public interest to postpone review" until the actual environmental harm has been effectuated. *American Motorcyclist Ass'n v. Watt*, 543 F.Supp. 789, 794 (C.D.Cal.1983). The areas in question have been precluded from wilderness consideration by the Secretary's action and may at any time be opened to nonwilderness uses. " '[D]ecisions to be made now or in the short future may be affected' by whether we act. 'One does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough.' " *Pacific Gas & Electric v. State Energy Resources Conservation and Development Comm.*, 461 U.S. at 201, 103 S.Ct. at 1721, *quoting Pennsylvania v. West Virginia*, 262 U.S. 553, 593, 43 S.Ct. 658, 663, 67 L.Ed. 1117 (1923). I find that plaintiffs' claims are ripe for adjudication.

## IV

## JOINDER

### A. *Intervenors' Motion*

Intervenors, Mountain States Legal Foundation and Montezuma County, Colo-

rado (hereinafter "MSLF" or "intervenors") have moved to require plaintiffs to join all owners of mineral interests on lands affected by this litigation in eleven western states. In the alternative, they seek an order of the court requiring plaintiffs to give notice to the same class of the pendency of this litigation. MSLF contends that all such mineral lessees, holders of mineral reservations, prospecting permittees, and mining claimants (hereinafter "mineral interest owners") claim or, at some indefinite date in the future, may claim a right to proceed with development activities in the areas that are subject to the Secretary's action.[18]

MSLF first argues that plaintiffs must join the mineral interest owners as "indispensable parties" since disposition of this action in their absence may as a practical matter impair their ability to protect their interests. Prosecution of the plaintiffs' claims and implementation of plaintiffs' prayer for relief, MSLF asserts, will necessarily require a determination of the scope and content of the valid existing rights protected by section 701(h) of FLPMA, 43 U.S.C. § 1701 n. (h) and the suit potentially may result in reimposition of "onerous" nonimpairment management standards. *See* Fed.R.Civ.P. 19(a)(2)(i). Since joinder of these parties is impossible because these individuals could not all be served in one district, MSLF argues that the court should consider whether non-joinder of these parties mandates dismissal of the case. *See* Fed.R.Civ.P. 19(b).[19]

If the rule 19 argument does not prevail, intervenors fallback position is that the due process clause of the Fifth Amendment requires that the mineral interest owners be

---

**18.** Four types of property interests are at stake: subsurface estate mineral fee owners, holders of valid mining claims, federal mineral lessees, and holders of prospecting permits. While the incidents of each interest may be different, and under certain circumstances would require close examination for analysis of both the issues of joinder and due process, the court will assume that the interests of these putative defendants is sufficient to give rise to some property

right. *See* n. 34, *infra*. The court notes that this assumption is made because resolution of both the rule 19 and due process claims appears possible without a closer analysis of the nature and scope of each interest.

**19.** Intervenors assert that the names of the individual mineral rights owners are readily ascertainable through BLM records and tax roles.

given notice and an opportunity to intervene in the litigation. Intervenors argue that if plaintiffs prevail, the reimposition of nonimpairment management standards on the lands released by the Secretary's order for multiple use management will destroy the economic viability of conducting mineral and other development activities which the "valid existing rights" language of FLPMA was designed to protect. They argue that such a result requires notice and an opportunity to be heard from those potentially adversely affected.

Plaintiffs, a coalition of environmental organizations and the State of California, oppose the motion on three grounds. They argue that the mineral interest owners need not be joined and are not entitled to personal notice and an opportunity to intervene since their interests will not be impaired by this litigation. Nothing in the relief they seek, plaintiffs argue, will in any way conflict with or impair the valid existing rights protected by FLPMA. Plaintiffs further argue that both rule 19 and due process standards require the imposition of only realistic notice and hearing burdens. Here the burdens that intervenors seek to impose on plaintiffs are neither practical nor realistic and, they assert, would preclude the bringing of this case and other similar litigation challenging federal actions of this type. Finally, plaintiffs argue that even if some sort of joinder or notice would be required under the circumstances, the so-called "public interest exception" to rule 19 relieves them of that burden.

## B. *Rule 19*

I begin with an examination of the joinder requirements under the Federal Rules of Civil Procedure.[20] Joinder in the federal system is governed by Fed.R.Civ.P. 19.[21] Under the rule, the issue is whether the absent mineral interest owners are within the class defined by rule 19(a)(1)–(2) and, if so, is dismissal of this litigation required because they cannot all be joined in this litigation.

### 1. *Burden of Persuasion* [22]

Curiously, although rule 19 analysis is grounded in practicality and equity, cases rarely address the question of which party bears the burden of persuasion. The question appears to be unaddressed in this circuit.[23] Moreover, cases which have addressed the question have done so in a

---

20. Commencing analysis with rule 19 is compelled by this court's obligation to avoid constitutional adjudication if fairly possible. *United States v. Clark,* 445 U.S. 23, 27, 100 S.Ct. 895, 899, 63 L.Ed.2d 171 (1980).

21. Rule 19 provides in pertinent part:

(a) *Persons to be Joined if Feasible.* A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence *complete relief* cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party....

(b) *Determination by Court Whenever Joinder not Feasible.* If a person as described in sub-division (a)(1)–(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

22. For reasons I have explored elsewhere, *see Kouba v. Allstate Ins. Co.,* 523 F.Supp. 148, 153 (E.D.Cal.1981), *rev'd on other grounds,* 691 F.2d 873 (9th Cir.1982), I avoid use of the term "burden of proof."

23. Federal law, of course, governs issues of joinder. *Provident Bank & Trust Co. v. Patterson,* 390 U.S. 102, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968).

most laconic style. The two district courts which have held that the party asserting joinder bears the burden have done so with little analysis. *See Ratner v. Scientific Resources Corp.*, 53 F.R.D. 325, 329 (S.D. Fla.1971), *appeal dism.*, 462 F.2d 616 (5th Cir.1972) ("Defendants have alleged no facts to indicate that the above requirements for compelling joinder [Fed.R.Civ.P. 19(a)(1)–(2)] have been met"); *Atlantic Aero Inc. v. Cessna Aircraft Co.*, 93 F.R.D. 333, 334 (M.D.N.C.1981) ("Rule 19(a) requires that Cessna show that the pilot is a 'person to be joined' within the meaning of the rule. If Cessna makes such showing, it may then go on to argue that the pilot is indispensable ..."). On the other hand, the only case which may be read as placing the burden on the party resisting joinder is equally unenlightening. *Boles v. Greeneville Housing Authority*, 468 F.2d 476, 478 (6th Cir.1972). ("Where an initial appraisal of the facts reveals the possibility that an unjoined party is arguably indispensable, the burden devolves upon the party whose interests are adverse to the unjoined party to negate the unjoined party's indispensability to the satisfaction of the court.").[24]

 Ordinarily, of course, the issue of non-joinder is brought to the court's attention by a motion to require joinder or dismissal. This configuration would suggest that the moving party bears the risk of nonpersuasion. "The general rule is that the proponent of a motion bears the burden of proof." *United States v. Veon*, 538 F.Supp. 237, 245–46 (E.D.Cal.1982). Nonetheless, the question is not quite so easily resolved. Although the issue of non-joinder is not jurisdictional, *see Provident Bank & Trust Co. v. Patterson*, 390 U.S. 102, 119, 88 S.Ct. 733, 743, 19 L.Ed.2d 936 (1968), both a district court, and indeed a court of appeals, may raise the question on

its own motion. *See Boles v. Greeneville Housing Authority, supra.* Under such circumstances, it is unclear whether and how the conventional rule would apply.[25] From this fact it may at least be argued that the conventional rule ought not to apply simply because the issue of joinder was, by happenstance, raised by a party rather than the court.

Moreover, it is not uncharacteristic of our system that the burden of persuasion is placed on the party most likely to possess the evidence. Where a moving party seeks joinder under (a)(1) or (a)(2)(ii), that party would ordinarily be possessed of sufficient information so that it would be reasonable to place the burden on that party; however where, as here, (a)(2)(i) is the gravamen of the motion, it is not at all clear that the moving party will be in a position to demonstrate the facts. Unfortunately, this observation does not necessarily lead to the conclusion that the party resisting joinder should bear the burden for, as a practical matter, that party may be equally disabled.

 The court, frankly, finds the problem troubling and not easily resolved. Nevertheless, because the consequences to the opposing party may include dismissal of the lawsuit, the court determines that the burden should rest upon the party asserting the necessity of joining absent parties. I so find, first, because, as noted above, such an allocation is consistent with the conventional allocation of the burden in most cases. Second, the Supreme Court, by implication, has suggested at least, that such an allocation is appropriate. The Court has explained that one rationale for permitting a court of appeals to raise the issue of nonjoinder on its own motion is to "protect the absent party, who of course had no opportunity to plead and prove his interest below." *Provident Bank*, 390 U.S. at 111, 88 S.Ct. at 738. From this

---

**24.** Even *Boles* seems to suggest that the defendant has an initial burden of production. I note, however, in certain circumstances the complaint is required to contain "the names, if known to the pleader, of any persons as described in subdivision (a)(1)–(2) hereof who are not

joined, and the reasons why they are not joined." Fed.R.Civ.P. 19(c).

**25.** Indeed, it is arguable that the *Boles* court's holding is premised on the fact that there the court of appeals raised the issue on its own motion. *Boles*, 468 F.2d at 479.

language it is not unreasonable to infer that when a party in a lawsuit has raised the issue, that party has the burden of persuading the court that joinder is necessary. Moreover, the Court also suggested that if a party fails to raise issues of non-joinder in the trial court, "it is quite proper to consider it foreclosed." 390 U.S. at 110, 88 S.Ct. at 738. Such waiver would ordinarily only make sense if the moving party bore the burden of production and thus as a conventional matter the burden of persuasion. For all the above reasons, the court finds that intervenors bear the burden of persuasion.

### 2. The Claim, the Record, and the Interest at Stake

■ Intervenors' basis for joinder is rule 19(a)(2)(i).[26] Thus they must demonstrate that the absent parties claim an interest "relating to the subject matter of the action" disposition of which may, as "a practical matter impair or impede [their] ability to protect that interest." With this question in mind, the state of the record bears some consideration.

Plaintiffs assert that the case is ripe for disposition because those owning various mineral interests can, by virtue of the or-

der, exploit them thus resulting in irretrievable change in the present character of those BLM lands. Thus, plaintiffs have themselves, by their pleadings, recognized the first necessary element of intervenors' burden—namely, that there are absent persons who, to the degree the land is "the subject matter of the action," "claim an interest." [27] Nonetheless, because the court must address the question of whether as a "practical matter" these interests will be affected, it would appear that some further refinement of what interests exist is required.

Intervenors do not provide such an evidentiary base. Nonetheless the parties, in their briefing, do not dispute that hundreds, and indeed perhaps thousands, of varying interests exist. Under such circumstances, a further refinement beyond a general categorizing does not seem feasible. While a more refined analysis may not be possible, MSLF makes the not unreasonable argument that as a generic matter, a more restrictive management standard would, in some manner, adversely affect all those interests. Without deciding whether such broad claims, without an evidentiary base would suffice,[28] the court will turn to what it regards as the dispositive

---

**26.** Intervenors do not assert joinder is required under 19(a)(1), *i.e.,* those persons in whose absence "complete relief cannot be accorded among those already parties." That reticence is wholly appropriate. It is clear that the relief sought, invalidation of Secretary Watt's order, can be accomplished by those already parties to the litigation. As a practical matter, the only party that will be bound, and the only party who plaintiffs seek to bind is the United States acting through the Secretary of Interior. Relief will be determined by this court's order to the Secretary—no other parties need be bound, nor for (a)(1) purposes need they be parties to the suit. *See Eldredge v. Carpenters 46 Northern California Counties Joint Apprenticeship and Training Committee,* 662 F.2d 534, 537 (9th Cir. 1981), *cert. denied,* 459 U.S. 917, 103 S.Ct. 231, 74 L.Ed.2d 183 (1982). As Professor Moore has put it, " '[c]omplete relief refers to relief as between the persons already parties, not as between a party and the absent person whose joinder is sought." 3A Moore's Federal Practice ¶ 19.07–1[1], at 19–128 (2d ed.1980).

**27.** Deciding what is the "subject matter" of the litigation is itself a problem. Clearly, the subject matter in an ordinary sense are the various

orders of Secretaries Andrus and Watt. The absent landowners, however, have an "interest" in those orders and their legality only because those orders are purported to effect their interests in the land. If, as I explain *infra,* any interest in the land is essentially unaffected by this litigation, it is at least arguable that not only is the interest unaffected as a practical matter within the meaning of subsection (ii), but also that the absent mineral interest owners do not "claim an interest" in the "subject matter" of the litigation within the meaning of subsection (a)(2) at rule 19.

**28.** I pause here only briefly to note that the MSLF's argument cuts both ways. While the variety of interests and multiplicity of owners suggests that intervenors need not provide the evidentiary basis that they, as the bearer of the burden of persuasion, would ordinarily have to meet, it is also suggestive that joinder should not be ordered because, as a matter of equity and application of the factors articulated in 19(b), joinder is impractical.

issue—does this litigation affect whatever interests exist, in the manner required by rule 19?

I have noted that the issues this suit tenders are not, by the terms of plaintiffs' pleading, an adjudication of property rights qua property rights; rather, the suit tenders three questions of statutory interpretation and administrative review: One, as to the split-estate lands, did Congress intend to include these lands in the wilderness inventory? Two, as to the less than 5,000 acre lands, did Secretary Andrus improperly place those lands under the management protocol dictated by section 603 of FLPMA? Finally, what is the status of these lands in light of Secretary Watt's subsequent order? These questions present the court with the task of determining the scope and meaning of FLPMA and the Secretary's powers under it. The suit, then, does not directly deal with the absent parties' property rights. Under this analysis, intervenors have failed to prove that the absent property owners claim an interest in the subject matter of the litigation. Nonetheless, I recognize that the standard for rule 19 is practicality and thus the technical scope of the subject matter of the litigation may not serve as the only benchmark of resolution of a joinder motion. Here, however, as I explain below, as a practical matter the rights of the absent owners simply will remain substantially unaffected by this litigation.

FLPMA, as noted earlier, expressly protects valid existing rights as of the date of its enactment, October 21, 1976. Section 701(h) of FLPMA, 43 U.S.C. § 1701 n. (h). Defendant-Intervenors MSLF and Montezuma County do not suggest that plaintiffs' lawsuit impairs those valid existing rights. Instead, they contend that the lawsuit affects the practical interests of the mineral interest owners in that their future ability to protect their legal interests will be impaired as a result of an adverse ruling from this court. An examination of the

suit, however, suggests that intervenors' fears are unwarranted.

Plaintiffs seek a declaratory judgment that Secretary Watt's order releasing certain lands from wilderness review was in violation of FLPMA; that his order violated the environmental impact statement requirements of NEPA; and, that his order violated the notice and comment requirements of the APA. Plaintiffs urge this court to issue a permanent injunction prohibiting the Secretary from approving development activities on the lands in question that would impair their wilderness values. Plaintiffs also seek a permanent injunction requiring defendants to restore the lands to the wilderness inventory and to management under nonimpairment standards.[29]

Because the Secretary's order deals with two sets of lands, broadly characterized as the split estate lands, see § VI,A, and the less than 5,000 acre lands, see § VI,B, I examine the effects of this litigation on each separately.

### 3. *Split Estate Lands*

As to the split-estate lands, this litigation has only two potential results. The first would be an approval of Secretary Watt's order deleting these lands from the section 603 wilderness inventory. Such a decision, one favorable to the defendant-intervenors, would in no way impair or affect the interests of the mineral rights owners thus requiring joinder. The second potential result would be to find Secretary Watt's order erroneous as a matter of law and to return the split-estate lands to a wilderness review status.

In reviewing this latter potentiality for rule 19 joinder purposes, I first note that such a ruling would be a matter of statutory interpretation in light of the process employed by the Department of Interior. Thus any question of fact or law regarding whether any particular estate was properly included in Secretary Andrus' initial order would be reserved for future litigation and

---

**29.** The plaintiffs' prayer appears to the court to be the least consequential consideration in a rule 19 motion. Formulation of an order with

due regard to its possible effect on absent parties is specifically contemplated by the rule itself. *See* Fed.R.Civ.P. 19(b).

would not be directly affected by the case at bar. Moreover, even the imposition of the higher management standards which might occur by virtue of this litigation will have little or no effect upon the rights of the absent mineral rights owners. The uses existing on these lands at the time the statute was passed are protected by section 603(c), 43 U.S.C. § 1782(c). Put another way, the statute, through section 603, defines what interests are cognizable for rule 19 purposes, and those interests are as fully protected by the statute after as before disposition of this litigation.

### 4. *Less than 5,000 Acre Lands*

Interests in the land less than 5,000 acres are not governed by section 603. Rather, if Secretary Watt's order is invalidated and Secretary Andrus' order upheld, existing and new mining activities arising under the 1872 Mining Law will be regulated only to prevent unnecessary and undue degradation of the lands.[30]

Here again there are two possibilities—either the lands are maintained in multiple use status or the land is returned to a more restricted management status. In the latter case, whatever rights exist under the mining laws of 1872 are themselves unaffected, although they will be subject to the undue degradation language of the statute. Thus, whether absent landowners have any

rights, the scope of those rights, and whether those rights are being or will be unlawfully restricted by the management protocol imposed, because of the misapplication of the "undue degradation" language or otherwise, are issues simply not affected by this litigation. In sum, any rights preexisting an order of this court in this case are fully open and remain, in essence, unaffected by this litigation. The sole issue being decided here is the propriety of the various Secretaries' orders—a matter which in itself does not affect the "interests" which intervenors assert gives rise to a right of joinder.[31] In sum, whatever decision this court makes as to the less than 5,000 acre lands, mineral rights owners will still be able to exercise their rights under the 1872 Mining Law. These interests are protected both by the valid existing rights language of section 701(h) of FLPMA and by the provisions for the management of the less than 5,000 acre lands in the IMP. The absent owners may still exercise those rights under whatever management standards result from this court's resolution of this litigation.[32]

It thus appears to this court that, although the question of joinder relative to the less than 5,000 acre lands is more difficult, particularly given the practical ap-

---

**30.** The IMP provides in pertinent part:

 5. If a wilderness study area or inventory unit (except islands) is smaller than 5,000 acres, existing and new mining activities under the 1872 Mining Law will be regulated in that area only to prevent unnecessary or undue degradation of the lands—not to prevent impairment of wilderness suitability. ... The *Wilderness Inventory Handbook* provides for identification of wilderness study areas under 5,000 acres under certain conditions specified on page 12 of the handbook. Although section 603 of FLPMA does not require these areas to be given interim management, the Department has the authority under section 302 of FLPMA to manage these lands similarly. The Department's policy is to manage them under the Interim Management Policy, except with respect to mining claims located under the 1872 Mining Law. The authority to regulate activities to the nonimpairment standard with respect to the mining laws only applies to the areas that meet the criteria of section 603—i.e., either islands or roadless areas of 5,000 acres or more. Section 302

provides the authority to regulate mining on all public lands to prevent unnecessary or undue degradation.
IMP at 10.

**31.** Of course a more restrictive management protocol has an effect as a practical matter on the uses to which the land may be put, but that is a result of the statutory provisions and the various Secretaries' actions and not the litigation. If in fact other interests will be affected in some other manner, intervenors have simply failed to meet their burdens of production much less persuasion as to those rights.

**32.** That is not to say that problems may not arise for a particular mineral interest owner. If this suit results in a return of any particular piece of property to "undue degradation" management and that standard is misapplied, a taking claim may well arise. Such a condemnation case would, however, also be unaffected by this litigation.

proach of the rule, the absent mineral interest owners are not "indispensable parties" within the meaning of the rule or the case law interpreting the rule.[33] While a return to a more restrictive management protocol has practical effects on absent mineral interest owners, resolution of particular disputes is unaffected by this litigation.

### C. Public Interest Exception

The question of joinder of the owners of mineral rights in the less than 5,000 acre lands is a close one. Accordingly, the court will consider whether, even if as a preliminary matter, they should be joined pursuant to Fed.R.Civ.P. 19(a)(2), plaintiffs nevertheless need not join them. Plaintiffs assert that, even if rule 19 joinder is required by the potential effect of this case on the rights of the absent mineral interest owners, the so-called "public interest exception" first articulated in *National Licorice Co. v. NLRB*, 309 U.S. 350, 60 S.Ct. 569, 84 L.Ed. 799 (1940) bars the imposition of such a burden. The court agrees.

In *National Licorice,* the Supreme Court held that an NLRB enforcement action barring an employer from enforcing contracts with employees which violate the National Labor Relations Act was proper despite a failure of the Board to join the employees who were signatories to the contract at issue. The Court first noted that it was not within any court's power to make a binding adjudication of the rights of those parties not brought before it. 309 U.S. at 362, 60 S.Ct. at 576. Nonetheless, the Court recognized that the litigation would have a practical effect upon the rights and obligations of the absent employees under the contract; despite this conclusion the Court nevertheless held that joinder was not required. The High Court observed that "[i]n a proceeding so narrowly restricted to the protection and enforcement of public rights, there is little scope or need for the traditional rules governing the joinder of parties in litigation determining pri-

vate rights." 309 U.S. at 363, 60 S.Ct. at 577. Although first announced in the context of public agency action, the doctrine has evolved to include the assertion of public rights by private parties. *See Jeffries v. Georgia Residential Finance Authority,* 678 F.2d 919, 929 (11th Cir.), *cert. denied,* 459 U.S. 971, 103 S.Ct. 302, 74 L.Ed.2d 283 (1982); *Kirkland v. New York State Dept. of Correctional Services,* 520 F.2d 420, 424 (2d Cir.1975), *cert. denied,* 429 U.S. 823, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976); *Natural Resources Defense Council v. Berklund,* 458 F.Supp. 925, 933 (D.D.C.1978), *aff'd,* 609 F.2d 553 (D.C.Cir.1980); *Natural Resources Defense Council v. TVA,* 340 F.Supp. 400, 407 (S.D.N.Y.1971), *rev'd on other grounds,* 459 F.2d 255 (2d Cir.1972).

The exact contours of the public interest exception have not been defined; nonetheless its central concerns are clear. Where what is at stake are essentially issues of public concern and the nature of the case would require joinder of a large number of persons, rule 19's joinder requirements need not be satisfied. As the Eleventh Circuit recently put it, "when litigation seeks vindication of a public right, third persons who could be adversely affected by a decision favorable to plaintiff do not thereby become indispensable parties." *Jeffries v. Georgia Residential Authority,* 678 F.2d at 929. *National Licorice* was, of course, decided prior to the adoption of the present form of rule 19, and thus its failure to analyze the question in terms of the rule is unremarkable. Unfortunately, subsequent cases have also failed to apply the rule to public interest exception cases. Such textual support for the doctrine, however, is readily at hand.

In public rights cases, what is at stake by definition are constitutional, national statutory, or national administrative issues. Almost by the nature of the issues tendered by such litigation, the number of

---

**33.** Even if the court is in error, the inability to join hundreds of the putative defendants who reside outside the reach of this court's summons, and the limited effect, if any, of this suit on the absent owners, would preclude dismissal under rule 19. Because this issue is analyzed in the context of the "public interest" exception to joinder requirements, *see* § IV, C, *infra,* I do not engage in extended analysis of the issue here.

persons who will be affected as a practical matter is very large, and almost certainly a substantial number of those persons cannot be served in one district. To hold that such persons nevertheless must be joined or the case dismissed "would effectively preclude such litigation against the government." *Natural Resources Defense Council v. Berklund,* 458 F.Supp. at 933 (D.C.D.C. 1978). Rule 19 provides as a factor in considering the court's response to a joinder motion the issue of "whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder," Fed.R. Civ.P. 19(b). Clearly, the "public interest exception" is the effectuation of this provision.

Yet another source, however, justifies the exception. The rules themselves provide that "[t]hey shall be construed to secure the just, speedy and inexpensive determination of every action." Fed.R.Civ.P. 1. Surely justice cannot be done if public interest litigation is precluded by virtue of the requirements of joinder. Inevitably, the joinder of the large number of persons who could potentially be affected by public interest litigation, even if possible, is not feasible and certainly is not inexpensive. In sum, then, the public interest exception is supported by both rule 19 itself and rule 1, and just makes good sense.

The instant case is a fair example of the doctrine. It is brought by six public interest organizations who seek vindication of the provisions of FLPMA by a declaration that a ruling, adopted by the Secretary of Interior and affecting nationally held land in eleven western states, violates the law. On the other side of the issue is the United States government and intervenors, including a public interest group with a viewpoint different from the plaintiffs. Whatever the outer boundaries of the public interest exception, the instant case falls within the heart of it.

**34.** Those rights would vary with the character of the interest. The court does not differentiate between the different rights as it is not necessary to do so for the purposes of this Opinion.

## D. *Due Process*

▮ Because the court has determined that joinder is not required by rule 19, I must now address intervenors' argument that due process requires the court to order plaintiffs to provide "notice and an opportunity to intervene" to the absent mineral interest owners.

▮ The analytical process implicated by due process claims is well established. A party claiming the protection of the clause must first demonstrate "that the interest deprived [or in the instant case threatened to be deprived] was constitutionally protected (i.e., life, liberty, or property)"; *Haygood v. Younger,* 527 F.Supp. 808, 812 (E.D.Cal.1981), *hearing en banc ordered,* 729 F.2d 613. "Once it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972).

I begin with the question of whether this case threatens any interest of the absent mineral rights holders cognizable as an interest protected by the Constitution. The establishment of this interest is a necessary first step in due process analysis. *Board of Regents v. Roth,* 408 U.S. 564, 567, 577, 92 S.Ct. 2701, 2704, 2709, 33 L.Ed.2d 548 (1972). "Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Board of Regents v. Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. The mineral interests at issue in this case arise under the Mining Law of 1872. 30 U.S.C. §§ 22–24, 26–28, 29, 30, 33–35, 37, 39–42, and 47 (1971 & Supp.1983). That the mineral interest owners hold property rights which, if threatened, would trigger Fifth Amendment due process protection cannot reasonably be disputed.[34] The ques-

In general, each asserted interest has at least some recognizable character. For the split-estate lands, *see United States v. Union Oil of California,* 549 F.2d 1271 (9th Cir.), *cert. denied,*

tion remains, however, whether those interests are sufficiently implicated by the instant litigation so as to require notice and an opportunity to be heard under the Fifth Amendment. In other words, what process is due?

Because due process is a "flexible" concept, whose requisites turn upon the circumstances, analysis requires a determination of those circumstances, i.e., "a determination of the precise nature of the government function involved as well as of the private interest that has been [or will be] affected by governmental action." *Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). This determination is required because if the "private interest" is substantially unaffected by the "governmental function," and is essentially preserved for future consideration, the Fifth Amendment may require no process as, due in relation to the governmental function.

The "governmental function" here is, of course, this litigation.[35] Thus, it is appropriate as a first step to consider what due process standards attach to litigation. As I explain, that question in turn rests upon how the litigation will affect the property interests of the absent owners.[36]

■ "A fundamental requirement of due process is 'the opportunity to be heard' [citation omitted] . . . at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). Implicated in this formulation of the standard is the further question of meaningful to what? The answer seems straightforward enough— the hearing must be meaningful in terms of the threatened conduct. That is, if the conduct does not threaten the interest, due process does not require notice and an opportunity to be heard.[37]

In cases alleging the threat of deprivation of property without due process, the question may be put, is there a deprivation? Once a deprivation is threatened, the next question is frequently analyzed in terms of whether a pre or post "deprivation" hearing is required. *Compare Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) with *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). As I shall now explain, because this litigation does not in itself threaten any immediate deprivation, and because the absent landowners' rights, if

---

434 U.S. 930, 98 S.Ct. 418, 54 L.Ed.2d 291 (1977); *Occidental Geothermal, Inc. v. Simmons*, 543 F.Supp. 870 (N.D.Cal.1982); *Harris v. Chas. Pfizer Co.*, 385 F.2d 766, 769 (8th Cir. 1967). For mining claims, *see Best v. Humbolt Placer Mining Co.*, 371 U.S. 334, 335–38, 83 S.Ct. 379, 381–83, 9 L.Ed.2d 350 (1963) (government has power after providing notice and hearing to determine validity of unpatented mining claim); *Western Mining Council v. Watt*, 643 F.2d 618, 628 (9th Cir.), *cert. denied*, 454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981) ("an unpatented mining claim is a unique form of property which created in the owners a possessory interest in the land"). For mineral leaseholds, *see Union Oil Co. of California v. Morton*, 512 F.2d 743, 750–51 (9th Cir.1975). For prospecting permits, *see Peterson v. Department of Interior*, 510 F.Supp. 777 (D.Utah 1981).

**35.** Neither plaintiffs nor defendants assert that either Secretary Andrus or Secretary Watt's orders were issued without the process due the mineral interest owners. Intervenors only assert that continuing this litigation without notice and an opportunity to be heard would vio-

late the due process provisions of the Fifth Amendment.

**36.** MSLF's standing to raise the due process rights of the absent mineral owners is uncontested by plaintiffs. As a general matter, of course, constitutional rights are personal, and thus those not suffering the violation of the constitutional right complained of have no standing as to the deprivation. I recognize, of course, that standing has a constitutional dimension and thus affects this court's jurisdiction, *see Valley Forge*, 454 U.S. 464, 471, 102 S.Ct. 752, 757, 70 L.Ed.2d 700 (1982). Thus as an ordinary matter it should be considered before reaching the issue of whether notice is required. Because plaintiffs did not raise the issue, and because I have found that due process does not require notice in this case, I believe that no harm is occasioned by my failure to raise on my own and then resolve the standing issue.

**37.** As my brother in the Eastern District, Judge Ramirez, frequently observes, "no harm—no foul."

threatened, are fully preserved for litigation, notice and opportunity to be heard in this litigation does not appear to be required by the due process clause.[38]

I have noted in the context of the rule 19 discussion above, that by virtue of section 603(c), 43 U.S.C. § 1782(c), Congress specifically protected any valid existing rights. *See also* section 701 of FLPMA, 43 U.S.C. § 1701 n. (h), ("[a]ll actions by the Secretary concerned under this Act shall be subject to valid existing rights"). It is clear from this language that Congress meant to protect the mineral interest owners' rights that MSLF asserts are affected by this litigation. Accordingly, as a threshold matter, intervenors' argument that these rights will be determined by this litigation is without basis.

Intervenors do acknowledge that the "valid existing rights" language of FLPMA protects the rights of mineral interest owners. Nonetheless, they argue that the application of a stricter management standard to the lands in question is a potential consequence of this litigation and thus requires notice to the absent owners. I have already discussed and rejected this argument in the context of the rule 19 discussion, *supra*. I find this argument in the present context equally unpersuasive.

First, given the breadth of the statutory language, it is difficult to identify what rights would fall outside the valid existing rights language of the statute. To the degree that MSLF argues that rights are being affected by this litigation which do fall outside that language and do not demonstrate another source for the right, it follows that they are not "valid existing rights," and thus not property interests falling within the protection of the due process clause. Put another way, either the interest is a valid existing right protected by the property provision of the due process clause and unaffected by this litigation or it is not, and thus is not subject to due process protection.

A second reason, focusing on the nature of the governmental function in issue, also suggests that intervenors' argument must be rejected. It must be kept in mind that this litigation seeks to test the legality of orders of the Secretary having national impact. Shorn of its trappings, intervenors' argument is that any time litigation involving a national regulation is filed every American citizen affected thereby must be given notice. The mere statement of the proposition belies it. As I have previously observed in another context, "[o]ur Constitution has always been viewed as a great document of practical governance as well as the embodiment of our most precious values." *Potter v. Rain Brook Feed Co.*, 530 F.Supp. 569, 580 (E.D.Cal.1982). A reading of our Constitution that would, as a practical effect, stifle litigation as to national rules must be rejected on the basis that the law forbids the reading of statutes (much less the Constitution) to reach absurd results.[39]

---

**38.** Because of the analysis undertaken, *supra*, I do not engage in an alternative analysis which suggests that in any event due process does not require notice and an opportunity to be heard in this litigation, because a "post-deprivation" hearing would suffice. *See Matthews v. Eldridge.* As a practical matter, both modes of analysis result in the same conclusion.

**39.** I do not mean to suggest that the due process clause never requires notice to anyone but those already parties when the subject of the litigation is a national rule. Certainly situations involving national rules which, as a practical matter, affect a limited group in a unique way may give rise to a right to notice and an opportunity to be heard. *See, e.g., Stratman v. Watt*, 656 F.2d 1321 (9th Cir.1981), *cert. dism.*, 456 U.S. 901, 102 S.Ct. 1744, 72 L.Ed.2d 170 (1982). *Strat-*

*man* held that the failure of the government to give the owners of grazing leases actual notice, as opposed to published notice, of administrative proceedings regarding the proposed certification of a native village under the Alaska Native Claims Settlement Act required the district court to reconsider, on remand, the issue of whether the owners were barred by the doctrine of the exhaustion of administrative remedies from challenging the certification of the village. *Stratman* carved out a potential exception to the general rule of exhaustion on due process grounds. 656 F.2d at 1325–26. *Stratman* dealt with two property owners readily identifiable and available for service. Under the "flexible" standards of due process, *Stratman* tenders entirely different questions than the present litigation.

328

The due process cases MSLF relies upon simply do not apply to the posture of this litigation. They do not involve challenges to national regulations, and in every case the plaintiff challenging the action was identifiable, amenable to service, and was deprived of a property interest in a direct and substantial manner. *See Mennonite Board of Missions v. Adams*, 462 U.S. 791, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983) (complete forfeiture of a security interest requires personal service or notice by mail in order to satisfy due process); *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950) (judicial settlement of accounts of pooling of small trust estates into one common fund, whereby the investments were recharacterized required notice by mail of those beneficiaries whose addresses were readily ascertainable); *Walker v. City of Hutchinson*, 352 U.S. 112, 77 S.Ct. 200, 1 L.Ed.2d 178 (1956) (notice of condemnation proceedings published in a local newspaper was an inadequate means of informing a landowner whose name was known to the city and was on official records); *Schroeder v. City of New York*, 371 U.S. 208, 83 S.Ct. 279, 9 L.Ed.2d 255 (1962) (publication in a newspaper and posted notices were inadequate to apprise a property owner of condemnation proceedings when his name and address were readily ascertainable from the deed and tax rolls); *Greene v. Lindsey*, 456 U.S. 444, 102 S.Ct. 1874, 72 L.Ed.2d 249 (1982) (posting a summons on the door of a tenant's apartment was an inadequate means of providing notice of forcible entry and detainer actions). Cases such as the above, turning on a limited group of persons with individual rights particularized and distinct from others, availability for service, and not growing out of a challenge to national regulations, simply have no bearing on the issues tendered here.

Having said as much, the court must disavow in advance a potential misreading of my disposition. Mere administrative inconvenience can never, in itself, justify dispensing with the requisites of due process. All that the court holds here is that a plaintiff who sues the appropriate federal official challenging that official's determination of an issue involving potentially hundreds of others, where identification of those individuals would be time-consuming and expensive, and where the suit is predicated on that official's purported violation or misinterpretation of a national statute, need not join all the other citizens potentially affected by the litigation.[40] For all of the reasons set forth above, intervenors' motion predicated on the due process clause is DENIED.

V

STANDARDS OF REVIEW

A. *"Legislative v. Interpretative Rulemaking"*

Plaintiffs attack Secretary Watt's order and the implementation thereof as unlawful. Preliminarily, then, it is necessary to determine the appropriate scope of judicial review of the Secretary's actions.[41] As I explain below, the substantive scope of review rests upon the distinction recognized by the law between so-called "legislative" and "interpretative" rulemaking. *See Batterton v. Francis*, 432 U.S. 416, 425, 97 S.Ct. 2399, 2405, 53 L.Ed.2d 448 (1977).[42] Before resolving the character of the orders at bar, I briefly explain the develop-

---

**40.** Indeed, it appears to the court that it is just these notions which underly the public interest exception. *See*, § IV, C, *supra*. That fact is hardly surprising since rule 19, dealing as it does with notice and an opportunity to be heard, considers the same values as the due process clause. *See* 3A *Moore's Federal Practice* ¶ 19.01–1[1–2] (2d ed. 1984).

**41.** Because the parties agree that there are no material facts in dispute and that the issues

tendered are purely legal, the court will not set out the well-established standards for summary judgment. *See, e.g., Soto v. City of Sacramento*, 567 F.Supp. 662, 668 (E.D.Cal.1983).

**42.** The proper characterization of the Secretary's order also helps frame consideration of plaintiffs' claim that the Secretary violated the Administrative Procedure Act, 5 U.S.C. §§ 551–59, by not allowing notice and comment. *See* § VI, C, *infra*.

ment of the distinction and examine the consequences of classifying a rule as either "legislative" or "interpretative."

■ It is, of course, fundamental to our tripartite form of government that the power to legislate rests in the Congress.[43] As late as the early 1930's the Supreme Court had said, "[t]hat the legislative power of Congress cannot be delegated is, of course, clear." *United States v. Shreveport Grain and Elevator Co.*, 287 U.S. 77, 85, 53 S.Ct. 42, 44, 77 L.Ed. 175 (1932). As the leading American authority on administrative law points out, however, even in 1932 the lack of power to delegate was unclear, and shortly thereafter "the nondelegation doctrine died gradually and the rise of legislative rules came during its dying period." 2 Davis, *Administrative Law Treatise* § 7.9 at 44 (2d ed.1979). The term that developed to refer to those rules adopted pursuant to Congress' power to delegate lawmaking power to the Executive was "legislative rules," in contrast with "interpretative rules." *Id.* at § 7.9. The fundamental distinction between "legislative" and "interpretative" rules, then, turns on whether Congress has by statute provided the agency with specific power to adopt rules to implement a statute. *Contrast General Elec. Co. v. Gilbert,* 429 U.S. 125, 141, 97 S.Ct. 401, 410, 50 L.Ed.2d 343 (1976) (interpretative rule where "Congress ... did not confer ... authority to promulgate rules or regulations ...") with *Batterton v. Francis,* 432 U.S. 416, 425, 97 S.Ct. 2399, 2405, 53 L.Ed.2d 448 (1977) (legislative rule where "Congress ... expressly *delegated* to the Secretary the power to prescribe standards ..." (emphasis in the original)).

■ The consequences of characterization of a rule as interpretative or legislative are multiple. One consequence relates to the scope of judicial review. Where Congress has specifically authorized the making of rules, the court's scope of re-

view is substantially limited; on the other hand, interpretative rules are freely reviewable. As Judge Tamm observed in *Joseph v. United States Civil Service Commission,* 554 F.2d 1140, 1154 n. 26 (D.C.Cir.1977):

> Classification of a rule as legislative has implications beyond the conclusion that [5 U.S.C.] section 553 notice and comment procedures apply. Legislative rules have the full force of law and are binding on a court subject only to review under an arbitrary and capricious standard. Interpretative rules do not have the force of law and even though courts often defer to an agency's interpretative rule they are always free to choose otherwise.

The distinction and the different standards are well recognized in this circuit. *See Stoddard Lumber Co. v. Marshall,* 627 F.2d 984, 987 (9th Cir.1980). Because an interpretative rule is freely reviewable, the weight a court will accord it "will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944).[44] On the other hand, where Congress has provided the Executive with power to make rules, the rules have "the force of law," and court scrutiny is substantially limited.

### B. *Characterization of Secretary Watt's Order*

■ I turn to an examination of the Secretary's action to determine its proper characterization. By his order, the Secretary deleted certain lands from the wilderness review process created by section 603 of FLPMA and instructed the state BLM Directors to reassess the lands under a new standard. The question is: was this order issued pursuant to authority delegat-

---

**43.** "All legislative powers herein granted shall be vested in a Congress of the United States...." U.S. Const., art. I, § 1.

**44.** In a real sense, "interpretative" rules are like dicta, or the opinions of non-binding courts; their power turns on their persuasiveness.

ed to the Secretary to make rules concerning which lands were to be studied, and thus legislative in character, or was this the result of the Secretary's understanding as to which areas Congress had ordered him to study, and thus interpretative? Upon analysis it seems apparent that the actions as related to the over 5,000 acre parcels were interpretative in character.

While it is true that Congress has delegated to the Secretary broad powers to make rules relative to his management of public lands, *see, e.g.,* 43 U.S.C. §§ 1711, 1712(a), 1781(d) and 1782(a), those powers do not govern the instant issue. The question is whether the Secretary was given the power by Congress to determine by rule which land to study. The answer, at least as to the areas in excess of 5,000 acres, is provided by statute. Not only is no such power expressly given, on the contrary, section 603(a) of FLPMA, 43 U.S.C. § 1782(a) specifically instructs the Secretary to review "those roadless areas of five thousand acres or more ... identified during the inventory ... as having wilderness characteristics." In turn, Congress defined wilderness characteristics. *See* 16 U.S.C. § 1131(c). In effect, there was neither need nor room for rulemaking concerning roadless areas over 5,000 acres with wilderness characteristics—Congress had directed that they be studied.

Indeed, the Secretary's purported reasons for deleting the 5,000 acre split-estate lands demonstrates the interpretative character of the action. The Secretary asserted that in doing so he relied upon the IBLA's decision in *Santa Fe Pacific Railroad Co,* 64 IBLA 27 (1982). *See* n. 11. Yet in that decision itself, the IBLA explained that inclusion of the split-estates in the wilderness inventory could only be sustained by a "rigid and irrational adherence to the definition of 'public lands' provided at section 103(e)

of FLPMA." 64 IBLA at 33. Whatever the utility of such rhetoric as a tool for the analytic task, the language pointedly demonstrates the interpretative character of the decision. To the degree the Secretary relies on the IBLA decision, it cannot be doubted that he relied not on his rulemaking authority, but upon the Board's understanding of the statute, and its belief that the statute's definition must be interpreted in the manner it suggested.[45] I thus determine that the order reclassifying, i.e., deleting from the wilderness inventory all split-estates over 5,000 acres, was interpretative in character.

The conclusion that the Secretary's order was interpretative in character does not resolve the issue of the propriety of the order, it merely frames the analysis. As I noted above, such decisions are "freely reviewable." That is to say:

> When what is at stake is an agency's legal evaluation, we may grant some deference to the agency's construction of the law it is charged to administer. *Batterton v. Francis,* 432 U.S. 416, 97 S.Ct. 2399, 53 L.Ed.2d 448 (1977), but the final determination of a question of law is for the courts. *Social Security Board v. Nierotko,* 327 U.S. 358, 66 S.Ct. 637, 90 L.Ed. 718 (1946).

*Columbia Basin Land Protection Association v. Schlesinger,* 643 F.2d 585, 613 (9th Cir.1981) (Karlton, J., dissenting).

## VI

### PROPRIETY OF SECRETARY WATT'S ORDER

#### A. *Split-Estate Lands*

I first turn to an examination of the correctness of the Secretary's withdrawal of the split-estate lands, for these

---

**45.** I do not mean that the fact that the Secretary premised his order on the determinations made by an adjudicative body requires a finding one way or the other that the order was legislative or interpretative, although inevitably it does suggest that it is likely that such a rule would be interpretative. The point is, that the adjudicative body's decision rested upon its understanding of what property Congress had ordered studied, i.e., an interpretation of the statute, and not upon the asserted power of the Secretary to determine by rule what property was or was not to be studied.

lands form the nub of the controversy.[46] FLPMA represents an attempt on the part of Congress to balance a variety of competing land use interests and reflects the varying concerns of different constituent groups. Indeed, the competing nature of the uses which Congress intended FLPMA to address and the failure of Congress to adequately resolve these competing interests in the statute would seem to guarantee the type of litigation that is presently before this court.[47] This is particularly so for the lands opened in the early 1900's for agricultural and homestead settlement where the mineral rights were subject to reservation. *See Occidental Geothermal Inc. v. Simmons,* 543 F.Supp. 870, 871 (N.D.Cal.1982) ("In the long debates that preceded this legislation one congressman predicted that 'this bill will encourage litigation. I cannot imagine a more fruitful source of lawsuits than this bill as it is now worded' 45 Cong.Rec. 6045 (1910)").

Defendants argue that Secretary Watt's order is, as a first matter, a reasonable interpretation of the statute and entitled to great deference. Defendants further assert that the character of the split-estates as land with mining rights reserved preclude their study as wilderness areas and, finally, that the split-estates are not public lands within the meaning of the statute and should never have been considered as WSA's in the first place. Plaintiffs contend that the Secretary had no authority to delete the split-estate lands from the wilderness inventory, that mining activities in a WSA do not disqualify them for consideration as a possible wilderness, and that the valid existing rights of reserved mineral rights holders will not be impaired by the inclusion of the split-estate lands in the section 603 wilderness inventory.

Since the Secretary's decision was an interpretative ruling which reversed a previous policy and which required no special expertise beyond legal skills to make, I find as a first matter that the Secretary's decision is entitled to little, if any, deference.[48] I thus examine the decision essentially unfettered by the Secretary's action. I begin with the Secretary's contention that the removal of the split-estate lands from the WSA's was proper because as a matter of statutory interpretation they should never have been included in the first place. *See* n. 10.

"As with any case involving statutory interpretation, 'we state once again the obvious when we note that, in determining the scope of a statute, one is to look first at its language.' [citations omitted] 'Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive.' [citations omitted]" *North Dakota v. United States,* 460 U.S. 300, 312, 103 S.Ct. 1095, 1102, 75 L.Ed.2d 77 (1983). "When we find the terms of a statute unambiguous, judicial inquiry is complete, except in 'rare and

---

**46.** As noted above, the Secretary's withdrawal of these one-half million acres of split-estates triggered the removal of other lands no longer able to satisfy the WSA requirements.

**47.** While it is not unheard of for Congress to duck tough political problems by using vague language which appears to meet the demands of conflicting constituencies and thus send an essentially political problem off to be solved by courts whose judges need not stand for election, this statute is not necessarily of that character. Congress was dealing with vast acreage, of uncertain character. The need to inventory the land and to ascertain their character was thus a necessary first step to determining how to manage them; nonetheless, the world could not stop while the inventory was accomplished, and perhaps the most Congress could do was to tell the Secretary what interim management it desired. Arguably, except for lands whose charac-

ter would render them unsuitable for a given use if changed, Congress could do no more than provide general guidance even if such guidance, because it was less than specific, would engender litigation.

**48.** Varying degrees of deference are accorded to administrative interpretations, based on such factors as the timing and consistency of the agency's position, and the nature of its expertise. *Batterton v. Francis,* 432 U.S. 416, 425 n. 9, 97 S.Ct. 2399, 2405 n. 9, 53 L.Ed.2d 448 (1972). Given the fact that Secretary Watt's order in effect reversed Secretary Andrus, any deference to be accorded it is significantly diminished. *See Morton v. Ruiz,* 415 U.S. 199, 237, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270 (1974); *McGoog by and through Ferguson v. Hegstrom,* 690 F.2d 1280, 1284 (9th Cir.1982); *Flint v. California,* 594 F.Supp. 443, 448 n. 6 (E.D.Cal.1984).

exceptional circumstances.' [citations omitted]," *Garcia et al. v. United States,* —— U.S. ——, ——, 105 S.Ct. 479, 483, 83 L.Ed.2d 472 (1984); *Park 'n Fly, Inc. v. Dollar Park and Fly, Inc.,* —— U.S. ——, ——, 105 S.Ct. 658, 661, 83 L.Ed.2d 582 (1985).[49]

The statute, section 603(a) of FLPMA, in plain and unadorned language requires the Secretary to review "those roadless areas of five thousand acres or more ... of the public lands, identified during the inventory ... as having wilderness characteristics...." 43 U.S.C. § 1782(a).[50] The statute itself at section 103(e) provides a definition of public lands:

(e) The term "public lands" means any land and interest in land owned by the United States within the several States and administered by the Secretary of the Interior through the Bureau of Land Management, without regard to how the United States acquired ownership, except—

(1) lands located on the Outer Continental Shelf; and

(2) lands held for the benefit of Indians, Aleuts, and Eskimos.

43 U.S.C. § 1702(e).[51]

To say that the language is straightforward is to state the obvious. To apply the

---

**49.** The language above is a phrasing of the so-called "plain meaning rule." In a recent unpublished opinion I had occasion to express my frustration as to the uncertain status of the rule. I set those comments out here:

The varying expressions of the United States Supreme Court as to the force, effect, and nature of the "plain meaning rule" are extremely perplexing. These variances have in turn caused this court to express itself about the plain meaning rule in a variety of cases in a variety of ways which the court says, frankly, to its embarrassment, are sometimes contradictory. *See and compare, e.g., United States v. Salsedo,* 477 F.Supp. 1235, 1240 (E.D.Cal.1979) ("The words are plain and unambiguous—thus no construction is required or indeed permitted.") with *Consortium of Community Based Organizations v. Donovan,* 530 F.Supp. 520, 527 (E.D.Cal.1982) ("Nonetheless, recent Supreme Court and Ninth Circuit cases make it clear that the 'plain meaning' rule is no longer absolute but rather a flexible principle for ascertaining Congressional intent."); compare both with *United States v. Veon,* 538 F.Supp. 237, 243 (E.D.Cal.1982) ("As with any issue of statutory construction, consideration 'begins, as indeed it must, with the text and legislative history ...' [citations omitted].") In text I apply the expression of the rule found in *North Dakota v. United States,* a 1983 case, which has the virtue of being a later expression of the Supreme Court's view than *Watt v. Alaska,* 451 U.S. 259, 101 S.Ct. 1673, 68 L.Ed.2d 80 (the 1981 case relied on by this court in *Consortium of Community Based Organizations*) or *Busic v. United States,* 446 U.S. 398, 100 S.Ct. 1747, 64 L.Ed.2d 381 (the 1980 case relied upon by this court in *United States v. Veon*). Ours is a three level judicial system, reflecting the functions of each court. Thus, district courts decide cases, courts of appeal review for legal error, and the United States Supreme Court teaches. For obvious reasons, no court can strictly restrict itself to its

paradigmatic role; nonetheless the system depends on each court being attentive to its primary responsibility while dispatching its other duties.

**50.** The full text of the subsection is as follows:

Within fifteen years after October 21, 1976, the Secretary shall review those roadless areas of five thousand acres or more and roadless islands of the public lands, identified during the inventory required by section 1711(a) of this title as having wilderness characteristics described in the Wilderness Act of September 3, 1964 (78 Stat. 890; 16 U.S.C. 1131 et seq.) and shall from time to time report to the President his recommendation as to the suitability or nonsuitability of each such area or island for preservation as wilderness: *Provided,* That prior to any recommendations for the designation of an area as wilderness the Secretary shall cause mineral surveys to be conducted by the Geological Survey and the Bureau of Mines to determine the mineral values, if any, that may be present in such areas: *Provided further,* That the Secretary shall report to the President by July 1, 1980, his recommendations on those areas which the Secretary has prior to November 1, 1975, formally identified as natural or primitive areas. The review required by this subsection shall be conducted in accordance with the procedure specified in section 3(d) of the Wilderness Act [16 U.S.C.A. § 1132(d) ].

43 U.S.C. § 1782(a).

**51.** The IBLA majority in *Santa Fe Pacific Railroad Co.* endorses the startling notion of statutory construction that the public lands definition in section 103(e) of FLPMA may be ignored because it precedes the wilderness review provision of section 603 which is found "[F]ive hundred sections beyond that definition." 64 IBLA at 33. The rule of statutory construction is otherwise. "In seeking legislative intent we be-

statute to the split-estates over 5,000 acres seems equally straightforward. In such lands, the United States holds the interest in the surface estate while private parties hold the interest in the subsurface estate. Since the interest in the surface estate is an "interest in land owned by the United States," it appears clearly to fall within the definition of public land provided by the statute. Nor does the fact that private parties have an interest in the minerals below the surface appear to preclude their inclusion as WSAs because such a condition is incompatible with the status of wilderness. The definition of wilderness, incorporated into section 603(a), is directed at the surface attributes of public lands. *See* n. 8, *supra*. Indeed, this conclusion is wholly consonant with the Wilderness Act, 16 U.S.C. §§ 1131–1136, which section 603(a) of FLPMA specifies is the guide for the wilderness review process of FLPMA. The Wilderness Act expressly allows for the preservation and exploitation of mining claims and interests in wilderness areas.[52] Given that the Wilderness Act contemplates that the mining of claims may take place subject to reasonable regulation in wilderness areas, and that FLPMA adopts the same procedure and definition for wilderness classification as the Wilderness Act, and given that the FLPMA definition of public lands clearly includes interests in land, there seems to be little doubt that Congress intended the split-estate lands to be included in the wilderness inventory.

The IBLA found and the defendants argue that such an interpretation is too rigid. The defendants suggest that the statute must be read in conjunction with other responsibilities of the Secretary. *See Sante Fe Pacific Railroad Co.* 64 IBLA at 33. In this regard, they note that section 603(c) requires that management of areas as wilderness during the study period is nonetheless subject to existing mining rights and that section 701(h), 43 U.S.C. § 1701 n. (h), requires the Secretary's conduct be subject to all valid existing rights. From these two provisions, defendants argue that it is incorrect to interpret the statute to include split-estate lands as subject to wilderness evaluation. I consider each statute in turn.

Section 603(c) provides that the "Secretary shall continue to manage such lands ... so as not to impair the suitability of such areas for preservation as wilderness, subject, however, to the continuation of existing mining and grazing uses and mineral leasing ..."[53]

---

gin with the words of the statute [citations omitted] and read the subsection in issue in the context of the statute as a whole. [citations omitted]. *Flint v. State of California* 594 F.Supp. 443, 447 (E.D.Cal.1984). *See United States v. Morton,* — U.S. —, —, 104 S.Ct. 2769, 2773, 81 L.Ed.2d 680 (1984) ("We do not, however, construe statutory phrases in isolation; we read statutes as a whole"). Not only is the Board's assertion incorrect as a matter of statutory interpretation, but in actuality 46 sections intervene between the two sections.

**52.** "Mineral leases, permits and licenses covering lands within national forest wilderness areas designated by this chapter shall contain such reasonable stipulations as may be prescribed by the Secretary of Agriculture for the protection of the wilderness character of the land consistent with the use of the land for the purposes for which they were leased, permitted or licensed." 16 U.S.C. § 1133(d)(3).

**53.** The full text of Section 603(c), 43 U.S.C. § 1782(c), reads as follows:
During the period of review of such areas and until Congress has determined otherwise, the Secretary shall continue to manage such lands according to his authority under this Act and other applicable law in a manner so as not to impair the suitability of such areas for preservation as wilderness, subject, however, to the continuation of existing mining and grazing uses and mineral leasing in the manner and degree in which the same was being conducted on October 21, 1976: *Provided,* That, in managing the public lands the Secretary shall by regulation or otherwise take any action required to prevent unnecessary or undue degradation of the lands and their resources or to afford environmental protection. Unless previously withdrawn from appropriation under the mining laws, such lands shall continue to be subject to such appropriation during the period of review unless withdrawn by the Secretary under the procedures of section 1714 of this title for reasons other than preservation of their wilderness character. Once an area has been designated for preservation as wilderness, the provisions of the Wilderness Act (16 U.S.C.A. § 1131 et seq.) which apply to national forest wilderness areas shall apply with respect to

Two things seem directly contemplated by this provision; one, the mere fact that mining rights exist does not preclude management as, much less consideration for wilderness status, but two, that under such circumstances, some adjustment of the management practices might be required. Indeed, in the two decisions which have extensively discussed section 603 of FLPMA, split-estates have, at least impliedly, been viewed as falling within the definition of public lands. *See Rocky Mountain Oil and Gas Ass'n v. Watt,* 696 F.2d 734 (10th Cir.1982); *State of Utah v. Andrus,* 486 F.Supp. 995 (D.Utah 1979).[54]

Nor do the provisions of section 701(h) require a different conclusion. There the statute requires that "all actions by the Secretary concerned under this Act shall be subject to valid existing rights." 43 U.S.C. § 1701, n. (h). Defendants argue that the subsurface estate carries with it implied easements for development and that the possible extraction of minerals is inconsistent with the protection of wilderness qualities. The IBLA's decision in *Sante Fe Pacific Railroad Co. (see* n. 11) was premised on similar reasoning. I have already noted that mining activities are by no means precluded by wilderness designation under the management restrictions of the Wilderness Act. *See* 16 U.S.C. § 1133(d)(3). They are, however, subject to strict controls.[55] Thus, the mere fact that the land contains mineral interests reserved to private parties in no way in itself implies that the land is not suitable for wilderness study. Indeed, recent congressional action explicitly confirms this fact. The California Wilderness Act of 1984, Pub.L. 98–425, 98 Stat. 1619

(Sept. 28, 1984) which designated certain areas in California as part of the national wilderness system provides:

Sec. 103(a). *Subject to valid existing rights,* each wilderness area designated by this title shall be administered by the Secretary concerned in accordance with the provisions of the Wilderness Act: *Provided,* That any reference in such provisions to the effective date of the Wilderness Act shall be deemed to be a reference to the effective date of this title.

98 Stat. at 1625 (emphasis added). If Congress was willing to provide that areas finally designated as wilderness are subject to "valid existing rights," as was done in the California Wilderness Act, it seems clear that the valid existing rights language of FLPMA would not preclude inclusion of such areas within wilderness study designation under the Act.

Inferences from another statute, however, are not necessary to resolve this issue. The fact that Congress specifically provided for mining activities to continue in WSA's under the provisions of section 603(c), 43 U.S.C. § 1782(c), directly demonstrates that defendants' position is untenable. If Congress had intended that the split-estate lands be excluded from the inventory it would not have expressly provided for the continuance of existing mining activities during the period of review. Section 603(c) provides what has been called the "management protocol" for the roadless areas during the period of review. As the *Rocky Mountain Oil and Gas Ass'n* court described the process:

comprehensive legislative framework envisaged by FLPMA belies defendants' contention that the split-estate lands are not "public lands" as defined in the statute.

the administration and use of such designated area, including mineral surveys required by section 4(d)(2) of the Wilderness Act [16 U.S. C.A. § 1133(d)(2), and mineral development, access, exchange of lands, and ingress and egress for mining claimants and occupants.

**54.** In *Rocky Mountain Oil and Gas,* the court described FLPMA as containing "comprehensive inventorying and land use planning provisions to ensure that the 'proper multiple use mix of retained public lands' be achieved." 696 F.2d at 739, *quoting* H.Rep. No. 1163, 94th Cong., 2d Sess. at 2. As I discuss more fully, *infra,* the

**55.** Defendant Santa Fe Pacific Railroad raised the issue in oral argument that placement in WSA status pending review and possible designation as wilderness areas reduces the market value of its property. Whether these controls amount to a taking of private rights without just compensation is a question to be addressed in another suit.

Thus, Congress intended that no activity on the public lands following the Act's passage be allowed to degrade lands containing wilderness values on the date of enactment, precluding their consideration for wilderness suitability before the review process was concluded. A qualified exception to this policy decision was made for "mining and grazing uses and mineral leasing."

696 F.2d at 747. Mining, mineral leasing and grazing activities taking place at the time of the enactment of FLPMA on June 21, 1976, are, in effect, grandfathered under section 603(c), 43 U.S.C. § 1782(c). Non-grandfathered mining activities are subject to the nonimpairment standards of section 603(c). As the Tenth Circuit stated, this interpretation "comports with common sense." *Id.* at 750. The court went on to explain:

> One of the prime concerns of Congress in enacting FLPMA was that BLM lands suitable for wilderness preservation at the date of the Act's passage be given a chance for consideration as wilderness. Under Interior's policy, the wilderness review period will result in only a brief hiatus from potential mineral development for most of the lands concerned. Lands containing oil and gas, and of no wilderness value, will be released from the review unharmed and fully suitable for mineral development.

*Id.* at 750.

From the above I conclude that there is nothing inherent in either section 603(c) or section 701(h) which requires the exclusion of the split-estate lands from inclusion within the term "public lands" and thus within the definition of those lands includable within the WSA's.

The IBLA in *Santa Fe Pacific Railroad Co.* nevertheless found that the ownership of the subsurface estate constitutes a "vested right" which could not be denied or extinguished by exercise of Secretarial discretion. Whatever validity the IBLA's premise has, it does not follow that such estates may not be studied for wilderness. The flaw in the IBLA majority's reasoning is that the placement of these areas into wilderness review and even eventually into wilderness designation does not deny or extinguish the owner's property right in the subsurface estate. The land may still be mined subject to certain controls under the Wilderness Act or Congress may choose to recompense the owner through exchange or payment. Finally, as the dissent in *Santa Fe Pacific Railroad Co.* notes, placing the land in WSA status may not have any adverse consequences to the owner of the subsurface rights since the Secretary's final recommendations may exclude such lands. 64 IBLA at 40–41.

A final basis for the IBLA's decision was that placement of the split-estate lands into the wilderness study under section 603 would be a futile exercise as the lands could never be placed in permanent wilderness status. 64 IBLA at 34. It appears to the court that the IBLA simply misconstrues the statutory scheme and the nature of the wilderness review process. As correctly noted by the dissent, the purpose of the study phase of the wilderness review is to allow the BLM to analyze each WSA's suitability for wilderness designation in conjunction with the whole range of other public land uses that Congress has authorized.[56] 64 IBLA at 41. The statutory scheme contemplated executive study but congressional disposition of wilderness issues. *See generally Parker v. United States,* 448 F.2d 793, 795–97 (10th Cir. 1971), *cert. denied,* 405 U.S. 989, 92 S.Ct. 1252, 31 L.Ed.2d 455 (1972). Clearly, if Congress elects to include within the wil-

---

**56.** The *Santa Fe Pacific Railroad Co.* dissent noted: "Thus, the mineral potential of any tract would be examined in the study phase to determine the impact that a permanent wilderness designation might have on such values. Moreover, this analysis is not limited to only mineral values, but embraces the full range of public uses, including grazing and recreational use, with an aim to determining the relative merits of a specific parcel's inclusion in the wilderness system. Indeed, the entire purpose of the study phase is the generation of data sufficient to make informed choices between competing claims to the land." 64 IBLA at 41, *quoting, Union Oil Co. (on Reconsideration),* 58 IBLA 166, 170 (1981).

derness preservation system split-estate lands, it may authorize the purchase or condemnation of the reserved mineral rights in the subsurface estate, or the exchange of reserved mineral rights for other federal lands or mineral interests.[57]

The other bases of the *Santa Fe Pacific Railroad Co.* decision have been discussed in the context of my analysis of the statutory language and need not be discussed here.[58] I conclude that the IBLA decision interpreted FLPMA incorrectly and thus, because of the Secretary's reliance thereon, the Secretary's December 30, 1982, order must be set aside.

Nonetheless, defendants have one more string to their bow. They argue that whatever this court's interpretation of the statutory language as it relates to the split-estates might otherwise be, it is precluded by authority binding on this court.[59]

In *Columbia Basin Land Protection Ass'n v. Schlesinger,* 643 F.2d 585 (9th Cir.1981) the court held, among other things, that privately held lands in which the United States has retained mineral rights are not subject to FLPMA's right-of-way requirements.[60] In resolving the issue the court relied upon previous cases which had interpreted the term "public lands" to mean "land 'subject to sale or other disposal under general laws' [citations omitted]," *id.* at 601, and does not include " '[a]ll land, to which any claims or rights to others have attached.' [citations omitted]" *Id.* at 602. Relying in part upon this premise the court explicated its specific holdings as follows: "We thus hold that privately held lands in which the United States has retained mineral rights are not subject to FLPMA's right-of-way requirements." *Id.* at 602. Then, after restating its reasons, the court articulated its second holding: "Consequently, we hold that the FLPMA right-of-way permit, as issued, is valid." *Id.* From these holdings defendants argue that I am bound by the Ninth Circuit's public lands definition and that definition precludes inclusion of the split-estate lands.[61]

---

57. Congress did exactly that in conjunction with the Cranberry Wilderness in West Virginia. H.R. 5161, 97 Cong. 2d Sess. *See* comments of Rep. Seiberling Cong.Rec.H. 3430–33, June 14, 1982.

58. Thus the IBLA found that the split-estates legally resulted in the mineral estates being severed from the surface and that the subsurface estate was dominant to the surface estate. Because of my analysis above I need not determine whether the IBLA's analysis is correct. Whichever estate is dominant, the question is whether such characterization necessitates non-inclusion in WSA's because inclusion is futile. For the reasons explained above, I find this simply is not the case.

59. As I have previously explained, as a subordinate court I am bound by decisions of the Supreme Court and the Ninth Circuit whether or not the holding was "misguided." *Harris v. Tomczak,* 94 F.R.D. 687, 698 (E.D.Cal.1982), *quoting Hutto v. Davis,* 454 U.S. 370, 375, 102 S.Ct. 703, 706, 70 L.Ed.2d 556 (1982).

60. By happenstance I was sitting on the panel that resolved *Columbia Basin* and dissented on grounds unrelated to the issues discussed in this opinion.

61. It is not at all clear that the court can entertain the argument. Nowhere in the Secretary's order or the IBLA decisions upon which he relied is there any indication that the decision was predicated upon the Ninth Circuit's definition of "public lands." Ordinarily decisions of administrative agencies "must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.,* 463 U.S. 29, 50, 103 S.Ct. 2856, 2870, 77 L.Ed.2d 443 (1983). The court may not accept counsel's post hoc rationalizations for agency action. *Id. See also Securities and Exchange Comm'n v. Chenery Corp.,* 332 U.S. 194, 196–97, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947); *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962); *FPC v. Texaco, Inc.,* 417 U.S. 380, 397, 94 S.Ct. 2315, 2326, 41 L.Ed.2d 141 (1974). While there are limited exceptions to the rule, *see, e.g., Public Power Council v. Johnson,* 674 F.2d 791, 793–94 (9th Cir.1982), they do not appear to apply here. The arguments considered in text are tendered by intervenors Mountain States Legal Foundation and not by the Secretary. Since those arguments are tendered by an intervenor in support of the Secretary's decision, however, I do not think the source of the argument makes any difference as to application of the rule. Nonetheless, because of the importance of this case and the fact that I believe the argument tendered does not require a different disposition, I dispose of it above. If I am wrong to consider the argument in the first place, all that I have done is worked harder than necessary.

I begin by observing that the specific holding of *Columbia Basin* confined to its narrowest ambit does not require me to find that the split-estate lands are not subject to inventory or inclusion within the WSA's. *Columbia Basin* dealt with the converse of the issue here; namely, where private individuals owned the surface but the United States owned the mineral rights. Indeed, the definition of lands excluded from the WSA's by Secretary Andrus in the WIH, excluded lands like those considered in *Columbia Basin* where the United States did not own the surface estate. *See* n. 6. Thus it may be said that *Columbia Basin's* holding does not directly affect Secretary Andrus' decision.

Such an observation, however, cannot end the discussion. It is clear that the broad language of the court's reasoning does lend support to defendants' position. While it may be argued that limiting *Columbia Basin* to its specific factual context requires no particular outcome in this case, such manipulation of the notions of holding and dicta appears inappropriate. The reasoning was necessary to the decision and cannot be disregarded. As I now explain, however, *Columbia Basin's* premise, that the term "public lands" did not include land in which others owned an interest has been completely undermined by subsequent Supreme Court authority, and can no longer be viewed as binding. *See LeVick v. Skaggs Companies, Inc.*, 701 F.2d 777, 778 (9th Cir.1983); *Heath v. Cleary*, 708 F.2d 1376, 1378 n. 2 (9th Cir. 1983).

The Supreme Court has recently discussed the historical development of the now thirty-three million acres of split-estate lands in *Watt v. Western Nuclear, Inc.*, 462 U.S. 36, 103 S.Ct. 2218, 76 L.Ed.2d 400 (1983). *Western Nuclear's* reasoning is simply incompatible with the premise that the traditional definition of "public lands" required that the United States own the entire fee. Throughout the opinion the Court recognized that, where the surface was patented but the United States retained mineral interests, the land did not lose its character as public lands. Indeed, the specific issue decided in *Western Nuclear* was whether mining of gravel under such circumstances was a trespass because it was an unauthorized removal of "mineral materials from public lands under the jurisdiction of the Dept. of Interior." 462 U.S. at 40, 103 S.Ct. at 2221. The Court resolved the issue in terms of whether gravel was a mineral. Clearly such a resolution was unnecessary if the gravel was not on "public lands." Given this intervening Supreme Court decision, *Columbia Basin's* broad language cannot be followed.

*Western Nuclear* also undermines *Columbia Basin's* reasoning in another way. The Ninth Circuit gave short shrift to the definition of "public lands" found in the statute itself. 643 F.2d at 601–02. The argument was premised on the notion that, because Congress chose to substitute "the traditional use of the term 'public lands'" for the term "national resource lands" Congress thereby "clearly" indicated its intent "to incorporate the term's traditional meaning." *Id.*[62] *Western Nuclear* explained, however, that the Stock-Raising Homestead Act of 1916 was "designed to supply 'a method for the *joint use* of the land by the entryman of the surface thereof and the person who shall acquire from the United States the right to prospect, enter, extract and remove all minerals that may underlie such lands.'" (emphasis in original). *Id.* at 50, 103 S.Ct. at 2226, *quoting* H.R.Rep. No. 35, 64th Cong., 1st Sess. 4, 18 (1916). As I have already explained, *see* § I, in FLPMA Congress changed national policy concerning BLM lands from a policy of divesting these lands to one of retaining them in the public domain. This policy applies to the surface and it is no longer Congress' intent to divest the government of surface rights to these lands. Thus, paraphrasing the Supreme Court in light of this change, the split-estate system is "de-

---

**62.** Given the fact that the court itself recognizes that "[t]here was no further discussion of the term in Congress," *id.*, one can only say that the premise is an extremely thin reed to justify departure from the explicit language of the statute found at section 103(e), 43 U.S.C. § 1702(e).

signed to supply a method of joint use [by the government] of the surface thereof and the person who shall acquire [or has acquired] from the United States the right to prospect, enter, extract and remove all minerals that may underlie such lands." Thus even if there was a traditional definition of "public lands" premised upon a national policy of divestiture, it would have little bearing upon a statutory definition of public lands premised upon retention. On examination, *Western Nuclear* taken together with FLPMA's statutory purpose clearly suggests that *Columbia Basin's* departure from the statutory definition of public lands in favor of an asserted traditional definition is unjustified.[63] In sum, the court is satisfied that the *Columbia Basin* decision is not binding as to the issue tendered herein but, rather, the plain language of the statute's definition of "public lands" and *Western Nuclear* compels a holding that the split-estate lands are "public lands."

I therefore conclude that the IBLA misconstrued FLPMA and the Secretary's decision premised upon that construction cannot stand. I find nothing in the IBLA opinion, the Secretary's argument, or *Columbia Basin* sufficient to support the Secretary's action. On the contrary, the

inclusion of split-estate lands in excess of 5,000 acres within the WSA's, where they are roadless areas and otherwise meet the criteria for wilderness as described in the Wilderness Act is, as an initial matter, required by FLPMA. The order as it pertains to the delisting of those areas and areas delisted by virtue of the delisting of those areas must be set aside.

### B. *Less Than 5,000 Acre Lands*

I now turn to an examination of plaintiffs' claims as to the other set of lands at issue in this litigation—the less than 5,000 acre lands.[64] These lands were formally designated as WSA's along with roadless areas of 5,000 acres or more by Secretary Andrus' order.[65] Secretary Andrus announced in that order that his authority to place these lands in wilderness review derived from section 603 of FLPMA. 43 U.S.C. § 1782.[66]

On December 30, 1982, Secretary Watt amended Secretary Andrus' order as to the less than 5,000 acre lands. 47 Fed.Reg. 58, 372 (1982). Secretary Watt declared that previous BLM decisions had improperly identified these lands for inclusion in the section 603 wilderness inventory. He noted that section 603 did not provide for inclusion in wilderness areas of less than

---

**63.** Indeed, *Columbia Basin,* in discovering the "traditional" meaning of public lands, ignored authority suggesting no such traditional meaning. As long ago as 1977, the Ninth Circuit had recognized that lands under the Stock-Raising Homestead Act of 1916, 43 U.S.C. §§ 291–302, in which the United States granted surface rights but retained mineral rights, were nevertheless "public lands." *See United States v. Union Oil of California,* 549 F.2d 1271, ·1273–79 (9th Cir. 1977). It is instructive that the patented lands in that case are described specifically as "public lands" even though the United States retained the subsurface mineral rights. *Id.* at 1273 ("The lands were public lands, patented under the Stock-Raising Homestead Act"). The *Columbia Basin* court never considered the *Union Oil* case.

**64.** By this term, I mean to include all areas of public land of less than 5,000 contiguous roadless acres placed in WSA status by Secretary Andrus' November 14, 1980, order. These lands are either: (1) contiguous with land managed by another agency which has been formally determined to have wilderness or potential wil-

derness values, (2) contiguous with an area of less than 5,000 acres of other federal lands administered by an agency with authority to study and preserve wilderness lands, and the combined total is 5,000 acres or more, or, (3) subject to strong public support for wilderness identification and of sufficient size to make practicable their preservation and use in an unimpaired condition and of a size suitable for wilderness management. *See* WIH at 6.

**65.** In that order the Secretary identified 23,772,-000 acres in 919 separate areas as WSA's out of a total of 174 million acres of public lands that had been subject to wilderness inventory under FLPMA. 45 Fed.Reg. 75,574 (1980).

**66.** For each of the eleven western states containing such lands, the various state directors, acting on behalf of the Secretary, stated: "I hereby announce my final intensive inventory decision under the authority of Sec. 603 of the Federal Land Policy and Management Act (FLPMA) ..." 45 Fed.Reg. 75,577, 75,584, 75,586, 75,589, 75,-590, 75,594, 75,597, 75,602 (1980).

5,000 acres and he thus deleted these areas from the status of WSA's. He asserted that, as a consequence of this decision, those lands were no longer to be subjected to the management standards for WSA's under wilderness review.[67] As a result of Secretary Watt's order, these lands may be considered for other less strict forms of management than wilderness but the lands are removed permanently from consideration for federal wilderness designation pursuant to 16 U.S.C. §§ 1131–1136.

Plaintiffs have challenged Secretary Watt's decision, asserting that the Secretary has misread the record and that his action violates both the provisions of NEPA, 42 U.S.C. §§ 4321–4361, and the APA, 5 U.S.C. §§ 551–559. Defendants respond by asserting that the Secretary properly read the record and that plaintiffs' position relative to NEPA and the APA are meritless. Underlying both parties' position is an assumption that if Secretary Watt properly deleted the less than 5,000 acre lands from the status of WSA's, they then must be in multiple use status. Because the court believes that premise is incorrect, I need not reach the NEPA issues tendered and need resolve only a limited aspect of the APA claims. Before explaining the court's reasoning, however, I must determine whether Secretary Watt's order deleting the under 5,000 acre lands is founded upon a proper legal basis.

Secretary Watt's order is simplicity itself. In it, Secretary Watt notes that Secretary Andrus' order asserted that his authority to include the under 5,000 acre estates was provided by section 603. Because section 603 requires study only of lands in excess of 5,000 acres, Watt determined that "previous decisions of the BLM

improperly identified [the less than 5,000 acre lands] as wilderness study areas." *See* n. 67, *supra.* Because of this legal error, Secretary Watt believed that as a matter of law those lands so designated must be deleted. In so finding, the Secretary took a remarkably narrow view of the administrative record. He limited his examination to the November 14, 1980, order and entirely ignored the rest of the administrative record. Secretary Watt thus ignored both the IMP which clearly demonstrated Secretary Andrus' reliance on his section 202 and 302 authority to designate these lands for wilderness review, as well as previous decisions of the IBLA which formed the basis of his Solicitor's opinion. Thus, in *Tri-County Cattlemen's Ass'n,* 60 IBLA 305 (1981), the Board recognized that inclusion of the under 5,000 acre lands under the authority of section 603 was improper. 60 IBLA at 314. Nonetheless, it noted that management of those areas as wilderness was well within the Secretary's discretion pursuant to sections 202 and 302. *Id.* Recognizing the Secretary's intent, as expressed in the IMP, to manage the property pursuant to those sections, the IBLA simply modified the BLM decision to recognize the true source of the Secretary's authority. 60 IBLA at 315; *See also Don Coops, et al.,* 61 IBLA 300, 305–06 (1982).

Under the circumstances, plaintiffs can and do mount a serious attack on Secretary Watt's decision, asserting that he ignored the record as a whole and that his decision is not supported by the record.

I first turn to the scope of review. "[A] reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an

---

67. In pertinent part, the Secretary's order as to these lands was as follows:

(1) *Areas Under 5,000 Acres.* The Interior Board of Land Appeals ruled that areas smaller than 5,000 acres do not qualify for wilderness study under Section 603 of the Federal Land Policy and Management Act (FLPMA). The wilderness review being conducted by the BLM is required by section 603 only with respect to roadless areas containing 5,000 or more acres of contiguous public lands, and

roadless islands of any size, that have wilderness characteristics. Previous decisions by the BLM improperly identified as wilderness study areas other roadless areas containing less than 5,000 acres. These areas, listed in Table 1, are deleted from the status of wilderness study areas, effective upon publication of this decision in the *Federal Register.* These areas will thereupon cease to be subject to the BLM's Interim Management Policy for Lands Under Wilderness Review.

agency action." 5 U.S.C. § 706. *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 413, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971). "[A] reviewing court shall ... (2) hold unlawful and set aside agency action, findings and conclusions found to be (A) ... not in accordance with law; ... [or] (C) in excess of statutory jurisdiction, authority, limitations, or short of statutory right; ..." 5 U.S.C. § 706. *Overton Park*, 401 U.S. at 413–14, 91 S.Ct. at 822; *MacKowiack v. Univ. Nuclear Systems, Inc.*, 735 F.2d 1159, 1162 (9th Cir. 1984). The Secretary's decision is, of course, entitled to deference depending on the circumstances. However, that deference "is not to shield his action from a thorough, probing, in-depth review." *Overton Park* at 415, 91 S.Ct. at 823. "The court is first required to decide whether the Secretary acted within the scope of his authority. [citation omitted]. This determination naturally begins with a delineation of the scope of the Secretary's authority and discretion [citation omitted] ... [and] [t]he reviewing court must consider whether the Secretary properly construed his authority ..." 401 U.S. at 415–16, 91 S.Ct. at 823. "In applying that standard [5 U.S.C. § 706(2)(A)], the focal point for judicial review should be the administrative record already in existence ..." *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973).

■ An examination of the record at bar under these standards requires the court to uphold Secretary Watt's deletion of the under 5,000 acre lands from the list of WSA's. While, to say the least, there is sufficient material in the record to support the inclusion of these lands under sections 302 and 202 of FLPMA, it is also clear that there is sufficient material in the record to support Secretary Watt's determination. *See Sierra Club v. Clark*, 756 F.2d 686 (9th Cir.1985) (an agency's interpretation of

its own regulation is entitled to high degree of deference). The plain words of the November 14, 1980, order declare section 603 to be the sole authority for the inclusion of all of the lands. As Secretary Watt noted, that section cannot support Andrus' decision. While such a focus is very narrow, Secretary Watt was entitled to rely on the specific language of Secretary Andrus' order, and he did so. Given the limited scope of review that this court is to exercise, it simply cannot be said that Secretary Watt's decision was without support in the record. Having said as much, it does not follow, as both sides presume, that the second aspect of Secretary Watt's order, namely that designating the deleted lands as subject to multiple use management, results from the order deleting these lands from section 603. Indeed, as the court explains below, it is this court's view that those lands are now in the status of lands potentially available for inclusion as WSA's and subject to management as such under the IMP.

To explain how the court has arrived at this conclusion, two separate strands of the history of the orders pertinent to these lands must be considered. First, I will briefly reexamine Secretary Andrus' order and then Secretary Watt's. The effect of this examination will be to demonstrate that Secretary Andrus, pursuant to his statutorily provided discretion, determined that the less than 5,000 acre lands were to be managed as potential wilderness areas and that Secretary Watt never exercised his discretion to change that determination.

It will be recalled that pursuant to sections 202 and 302, the Secretary of Interior had discretion to determine the management protocol for these lands. Moreover, as the IBLA correctly held, nothing in the law precluded the Secretary from recommending that these estates be designated for permanent wilderness status.[68] Secretary Andrus noted in the IMP that his

---

68. Because designation of a particular area as permanent wilderness is a legislative act, the fact that Congress provided as an initial matter that only lands over 5,000 acres must be studied for potential wilderness qualification in no way precludes Congress from changing its mind.

Thus, inclusion of any less than 5,000 acre parcel in a recommendation to the President to in turn be submitted to Congress, is properly viewed as no more than an executive recommendation for a legislative change.

determination to study the less than 5,000 acre parcels was an exercise of the discretion given him by sections 202 and 302, a discretion he clearly had. IMP at 6 n. 1 and 10. Thus, at all times prior to the December 30, 1982, order, the lands were being managed in that status pursuant to a discretionary decision based on explicit statutory authority.

By the November 14, 1980, order, Secretary Andrus attempted to change the status of the deleted lands and to formally designate those areas as WSA's pursuant to section 603. Secretary Watt, by his 1982 order, determined that the Andrus order was ultra vires, since section 603 did not provide authority to include the less than 5,000 acre estates in wilderness review. The court has found that the record is sufficient to support Secretary Watt's decision. The question, however, remains as to the effect of Secretary Watt's order on the management of those lands.

An ultra vires act of an administrative agency is either void or voidable.[69] *Manhattan General Equipment Co. v. Commissioner of Internal Revenue,* 297 U.S. 129, 134, 56 S.Ct. 397, 399, 80 L.Ed. 528 (1936) ("A regulation which ... operates to create a rule out of harmony with the statute, is a mere nullity."); *Pacific Gas & Electric Co. v. United States,* 664 F.2d 1133, 1136 (9th Cir.1982). Thus, for all practical purposes, Secretary Andrus' order as to the under 5,000 acre lands was and is of no effect. As a matter of logic, because the attempted change was ultra vires, those lands remain in the condition they were in prior to the order changing their status found ineffective by Secretary Watt. That is to say, until there is a lawful exercise of power, the exercise of discretion establishing their status has been unaffected. Put another way, because the status of the under 5,000 acre

lands was initially determined by Secretary Andrus as a study status for possible inclusion as WSA's and a management protocol consistent therewith was provided for, and since that decision was pursuant to a proper exercise of discretion, those lands continue in that status, until there is a further lawful exercise of discretion removing them from that status. Moreover, this is true not only as a matter of logic, but as a result of the very exercise of discretion at issue. The IMP provides that the management protocol for these lands was to apply during the time of study and until Congress acted. *See* § I,B, and IMP at 5. Although the November 14, 1980, decision purportedly ended the study period, because that order was found by Secretary Watt to be premised on incorrect legal authority, the study period has not ended in that a conclusion has not been reached. Thus, until a further exercise of discretion occurs, the land remains under the IMP management protocol. As I explain below, no decision to change that management protocol has been reached.

Secretary Watt's order deleting the under 5,000 acre lands was premised on his asserted belief that he was compelled to do so as a matter of law. Secretary Watt's decision to delete these lands was based on an opinion from his Solicitor dated December 15, 1982, which in turn was based on the IBLA decisions in *Tri-County Cattlemen's Ass'n* and *Don Coops, et al.*[70] The Solicitor asserted that "to the extent that non-island, roadless areas of the public lands of less than 5,000 acres have been designated as WSA's, such designations were without statutory support and have never been proper. The administration of those lands under section 603 *must* be immediately terminated." [emphasis added] *Solicitor's Opinion,* December 15, 1982, at 5. I emphasize this language because it

---

**69.** Because the effect of Secretary Watt's decision to remove the estates is effective as of the date of issuance, the court need not determine whether Secretary Andrus' order was void or voidable. Whether it was void ab initio or not, it was of no effect as of the date of Secretary Watt's order.

**70.** The Solicitor failed to note the *Tri County* decision's reliance on sections 202 and 302 as statutory authority to support Andrus' decision to include the less than 5,000 acre lands as WSA's.

fully supports defendants' contention in this litigation that the December 30, 1982, order was "non-discretionary" and legally compelled. Of course, an action compelled by law is the antithesis of a discretionary decision.

In the same way that this court is precluded from second guessing the narrow focus of Secretary Watt's examination of Secretary Andrus' previous order, I am also precluded from second guessing Secretary Watt's assertion of the reason he undertook the deletion of these lands. I must take Secretary Watt at his word and assume that in deleting these lands he was not exercising discretion, but obeying what he viewed as the compulsion of law.[71] The Secretary then asserted in his order that because these areas had been improperly listed under section 603 they must be delisted and thus subject to management for multiple use. That determination is just legally wrong. Since Secretary Andrus had exercised his discretion as to the proper management protocol for those lands, it would require a further act of discretion to change the management protocol. Because Secretary Watt misconceived or ignored the record relative to the management of those lands (however much he could rely on the November 14 order for determining the purported source of authority for inclusion of the under 5,000 acre estates as WSA's) he failed to exercise discretion as to how those lands were to be managed after delisting. Accordingly, the last valid exercise of discretion continues to govern. Because of this conclusion, the court holds that by virtue of Secretary Watt's rescission of Secretary Andrus' November 14 order, these lands reverted to their previous management protocol as set forth in the IMP. Because of this conclusion, the NEPA issues need not be resolved and the APA issues need only be addressed as to the first part of the Secretary's order.[72]

### C. *APA Claim*

As noted above, Secretary Watt's order as to the less than 5,000 acre lands was in two parts. The first part, which I have found has a legal basis, decided that section 603 of FLPMA did not contain statutory authority for the placement of the less than 5,000 acre lands in wilderness review. The second part of the Secretary's order which had the effect of opening these lands to multiple use, I have found to be without a legal basis since the Secretary had not exercised his discretion to determine a proper standard of management for those lands. Those lands thus remained subject to the nonimpairment management protocol imposed by the IMP for lands under consideration for wilderness review. Under this resolution, plaintiffs' claims under NEPA and the APA as to the second part of the Secretary's decision are not ripe for consideration. I am, however, left with the issue of whether the first part of the Secretary's decision implicates the APA.[73]

Plaintiffs argue that Secretary Watt's order was promulgated without prior notice and opportunity to comment in violation of the requirements of the APA.

---

**71.** One of my great predecessors once wrote, "we cannot shut our eyes to matters of public notoriety and general cognizance. When we take our seats on the bench we are not struck with blindness, and forbidden to know as judges what we see as men." *Ho Ah Kow v. Nunan,* 12 Fed.Cas. 252, 255–56 (C.C.D.Cal.1879) (No. 6,546) (Field, J.). Unfortunately, in the field of administrative law, the cases have imposed a self-inflicted blindness upon the judiciary. If free to do so, this court has no doubt that a very different characterization of both Secretary Andrus and Watt's orders would be more appropriate than that which I arrive at above.

**72.** Whether the new Secretary must comply with NEPA's procedural requisites, or what duties the APA imposes upon him, in the event that he wishes to exercise his authority to change the status of these estates is not properly before the court. It is simply unknown what course the present Secretary will follow. Courts of course are constrained not to render advisory opinions.

**73.** As the Secretary has not yet exercised his discretion to change the management protocol for the less than 5,000 acre lands, there is no major federal action within the meaning of 42 U.S.C. § 4332(c). Whether such a decision by the Secretary will trigger NEPA's EIS requirements is an issue that the court need not reach.

5 U.S.C. §§ 551–559. Defendants argue in opposition that the Secretary's order was declaratory in nature in that it interpreted the law and a previous agency decision and as such was not subject to the notice and comment provisions of the APA.

■■■ The resolution of this issue turns on the distinction between "interpretative" and "legislative" rulemaking. *See* § V, A. Under the APA, an agency's legislative, i.e., substantive, rules must meet certain notice and publication requirements before final implementation. 5 U.S.C. § 553;[74] *Zaharakis v. Heckler,* 744 F.2d 711, 713 (9th Cir.1984). Interpretative rules, however, are not subject to the APA's strict implementation requirements. 5 U.S.C. § 553(b)(3)(A); 744 F.2d at 713. Unlike legislative rules, interpretative rules "express the agency's intended course of action, its tentative view of the meaning of a particular statutory term, or internal house-keeping measures organizing agency activities." *Batterton v. Marshall,* 648 F.2d 694, 702 (D.C.Cir.1980); *Zaharakis v. Heckler,* 744 F.2d at 713.

The feature which distinguishes declaratory orders and other interpretative rulings from those legislative rules which must conform with the procedures established by the APA for rulemaking is not the extent of their effect, but rather that the order or ruling instead of creating new law serves only to clarify and state an agency's interpretation of an existing statute or regulation.

*British Caledonian Airways, Ltd. v. C.A.B.,* 584 F.2d 982, 990 (D.C.Cir.1978).

Here, the first part of Secretary Watt's order is clearly an agency interpretation of a statute and a determination that its previous conduct was not in conformance with that statute. "[A]n administrative agency is permitted to change its interpretation of a statute, especially where the prior interpretation is based on error, no matter how longstanding." *Chisholm v. F.C.C.,* 538 F.2d 349, 364 (D.C.Cir.), *cert. denied,* 429 U.S. 890, 97 S.Ct. 247, 50 L.Ed.2d 173 (1976); *see also Automobile Club v. Commissioner of Internal Revenue,* 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957) (commissioner may retroactively correct erroneous ruling of law as to tax exempt status of automobile club); *American Trucking Ass'n v. Atchison, Topeka and Santa Fe Railway Co.,* 387 U.S. 397, 416, 87 S.Ct. 1608, 1618, 18 L.Ed.2d 847 (1967). Secretary Watt was entitled to amend Andrus' order to bring his agency's conduct into conformance with the statutory mandate. Inasmuch as the Secretary did so, his decision is an interpretative decision which does not trigger the notice and comment requirements of the APA.[75]

## VII

## CONCLUSION

In *California v. Bergland,* I observed that environmental issues inevitably tender a set of conflicting interests and values. 483 F.Supp. at 501 (E.D.Cal.1980). I noted there that "[c]ourts, the least democratic of our political institutions, are ill equipped to strike the balances and tradeoffs for society." *Id.* What was true then is equally true today. The resolution of these conflicts should not be made by courts, but by the two political branches. Equally true, however, is the requirement that the political branches in resolving such conflicts must obey the law and courts must, in properly tendered lawsuits, determine

---

**74.** "The essential purpose of according § 553 notice and comment opportunities is to reintroduce public participation and fairness to affected parties after governmental authority has been delegated to unrepresentative agencies." *Batterton v. Marshall,* 648 F.2d 694, 703 (D.C. Cir.1980).

**75.** I need not reach plaintiffs' argument that Watt's order has such a "substantial impact"

under *National Motor Freight Traffic Ass'n v. United States,* 268 F.Supp. 90, 95 (D.D.C.1967), *aff'd* 393 U.S. 18, 89 S.Ct. 49, 21 L.Ed.2d 19 (1968), that elementary fairness requires public participation and the exceptions applicable to interpretative rules do not apply because the less than 5,000 acre lands remain in predesignation wilderness review status subject to nonimpairment management standards.

**344**

whether the political branches have done so.

In this much too lengthy opinion,[76] I have determined that the instant case is properly before this court and that in large measure the Secretary failed to follow the law. As to the split-estates, FLPMA closely defines the Secretary's obligations. As to the less than 5,000 acre estates, this opinion acknowledges that the Secretary has very broad authority. Whether Congress was wise in providing the Secretary with such broad authority, or whether the Secretary will exercise his broad discretion wisely is not for this court to say. Nonetheless, it is this court's responsibility to declare the law and then to apply it. In accordance with that duty, the court now determines:

1. The motion to require joinder of all owners of mineral interests or, in the alternative, to dismiss is DENIED;

2. The motion to require plaintiffs to give notice of the pendency of this litigation to all owners of mineral interests is DENIED;

3. The Secretary of Interior shall restore to WSA status all split estate lands (i.e., lands where the United States owns the surface but the subsurface mineral estate is owned by private parties) previously included by Secretary Andrus in his November 14, 1980, order and deleted by Secretary Watt in his December 30, 1982, order, whether such lands are themselves over 5,000 acres or whether deleted because they amounted to less than 5,000 acres as a result of the deletion of the split-estate lands.

4. The Secretary of Interior shall manage all less than 5,000 acre lands previously included by Secretary Andrus in his November 14, 1980, order and deleted by Secretary Watt in his December 30, 1982, order, pursuant to the nonimpairment management protocol specified in the WIH and IMP for potential inclusion as WSA's unless and until the Secretary exercises his

discretion in a manner permitted by law to change that status; and

5. Judgment shall be entered accordingly and plaintiffs shall have their costs of suit.

IT IS SO ORDERED.

---

**76.** Complexity does not lend itself to brevity without obscurity; how I wish it were otherwise.